FILED
United States Court of Appeals
Tenth Circuit

February 12, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CHARLES LEWIS,

Defendant - Appellant.

No. 08-1170

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

NORMAN SCHMIDT,

Defendant - Appellant.

No. 08-1171

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NOS. 1:04-CR-00103-REB-4 and 1:04-CR-00103-REB-1)**

---

Peter R. Bornstein, Law Offices of Peter R. Bornstein, Denver, Colorado (Keyonyu X O'Connell, Denver, Colorado, with him on the brief), and Jonathan S. Willett, Denver, Colorado, for Defendants - Appellants.

Matthew T. Kirsch and James C. Murphy, Assistant United States Attorneys, (David M. Gaouette, United States Attorney, with them on the brief), Denver, Colorado, for Plaintiffs - Appellees.

Before **HARTZ**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

## I.    INTRODUCTION

Norman Schmidt and Charles Lewis conducted a Ponzi scheme through a number of ostensible investment companies (the "scheme companies"). Prospective investors were told that they would be participating in an exclusive program that purchased high-yield notes whose principal was guaranteed by reputable insurers. But their money was never used to purchase such notes. Rather, funds from new clients were used to pay the operators of the scheme and to pay off earlier investors. The scheme, which lasted from April 1999 until late 2004, resulted in estimated losses to investors of more than $40 million.

Schmidt, Lewis, and two codefendants were tried before a jury in the United States District Court for the District of Colorado. Trial began on April 4, 2007. Evidence was presented over the course of six weeks, and jury deliberations lasted two weeks. Schmidt was convicted on one count of conspiracy, five counts of mail fraud, six counts of wire fraud, twelve counts of securities fraud, and thirteen counts of money laundering (and acquitted on five counts). He was sentenced to 330 years' imprisonment. Lewis was convicted on one count of conspiracy, two counts of mail fraud, one count of wire fraud, five

counts of securities fraud, and one count of money laundering (and acquitted on 12 counts), and was sentenced to 360 months' imprisonment.  One codefendant was convicted on three counts and acquitted on 27; the other was convicted on three counts and acquitted on 14.

Schmidt and Lewis raise a number of issues on appeal.  Schmidt contends (1) that there was insufficient evidence to sustain his convictions on four counts of wire fraud and one count of securities fraud; (2) that his sentence was procedurally and substantively unreasonable; and (3) that he was deprived of a fair trial by the district court's rulings (a) refusing to require the government to disclose matters necessary for the preparation and conduct of the defense (including boxes of bank records to be offered at trial, witness and exhibit lists, and a computer database used to prepare government exhibits), and (b) admitting hearsay statements by alleged coconspirators.  Lewis raises one issue also raised by Schmidt:  (4) that the district court improperly admitted coconspirator hearsay. He further argues (5) that the jury instructions on the conspiracy charge constructively amended the indictment to state a charge of aiding and abetting a conspiracy; (6) that the district court improperly denied his request for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to show that the affidavit supporting a warrant to search an office contained false information; and (7) that at sentencing, the district court (a) improperly calculated his offense

level under the United States Sentencing Guidelines and (b) improperly imposed consecutive sentences on several counts.

We reject all the contentions by Schmidt and Lewis, save one. (1) We agree with Schmidt that there was insufficient evidence to sustain his convictions on three counts of wire fraud and one count of securities fraud based on sales to investors solicited by Rebecca Taylor, an agent of a scheme company. The government concedes that it had no evidence that Taylor knew that her sales pitch was fraudulent, and it has failed to point to any evidence supporting the theory that Schmidt caused Taylor to make any of her false statements. We therefore reverse those convictions and remand to the district court to vacate the convictions and the sentences imposed on those counts. We affirm, however, Schmidt's conviction on the remaining challenged wire-fraud count; there was sufficient evidence of guilt even though the victim did not testify. (2) The district court properly calculated Schmidt's guidelines sentencing range and he has not overcome the presumption of reasonableness of his within-guidelines 330-year sentence (which is reduced to 310 years by our setting aside his convictions on four counts). (3) (a) Schmidt was not entitled to any of the disclosures he sought, and he has not shown any prejudice from nondisclosure. (3)(b), (4) Neither defendant has pointed to the admission at trial of any inadmissible hearsay. (5) The aiding-and-abetting instruction of which Lewis complains did not constructively amend the indictment because an indictment need not charge aiding

-4-

and abetting in addition to the substantive offense. (6) Lewis was not entitled to a *Franks* hearing because he did not allege that the affiant lied in the search-warrant affidavit. And (7) Lewis has not demonstrated that his offense level was improperly calculated or that consecutive sentences were improper.

## II. DISCUSSION

### A. Schmidt's Issues

#### 1. Insufficiency of the Evidence

Schmidt challenges the sufficiency of the evidence with respect to three counts of wire fraud (counts 12, 13, and 14) and two counts of securities fraud (counts 18 and 20). Wire fraud requires (1) a scheme to defraud; (2) intent to defraud; and (3) use of interstate wire or radio communications to execute the scheme. *See* 18 U.S.C. § 1343; *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003). Securities fraud requires (1) fraudulent conduct (2) in connection with the offer or sale of any security (3) by the use of any means or instruments of transportation or communication in interstate commerce. *See* 15 U.S.C. § 77q(a)(1); *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1433 (10th Cir. 1988). We review the sufficiency of the evidence de novo to assess whether a reasonable jury, viewing the evidence in the light most favorable to the government, could have found Schmidt guilty beyond a reasonable doubt. *See United States v. Baum*, 555 F.3d 1129, 1131 (10th Cir. 2009).

We first address the three counts of wire fraud and one count of securities fraud (count 18) based on transactions with two victims whose investments were solicited by Rebecca Taylor, apparently an agent of Reserve Foundation Trust (RFT), one of the scheme companies. Taylor gave false information to both investors. The government does not contend, however, that Taylor knew that her representations to the investors were false, or even that she has any criminal culpability for her conduct. Because Taylor did not herself act with criminal intent, Schmidt could not be liable as one who aided and abetted Taylor. *See United States v. Langston*, 970 F.2d 692, 705 n.12 (10th Cir. 1992) ("[A]s a prerequisite to aiding and abetting the government is required to prove that someone has committed the underlying substantive offense." (internal quotation marks omitted)). And the government does not contend that Schmidt conspired with her. Rather, its sole theory is that Schmidt is liable under 18 U.S.C. § 2(b), which states: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." In other words, the government contends that Schmidt is liable because he caused Taylor to make her false statements, even though she may not have known that they were false. *See United States v. McGee*, 291 F.3d 1224, 1226–27 (10th Cir. 2002) (discussing 18 U.S.C. § 2(b)).

The problem for the government is that it has failed to point to evidence of such causation. Its appellate brief relies exclusively on the testimony of the two

investors. They said that they had thought that Schmidt played an important leadership role within RFT and that they attempted to contact Schmidt after they became concerned about their investments. But the government does not cite any evidence that Schmidt knew that Taylor was making false statements to investors, much less that he caused her to make such statements. Although there may be such evidence in the record (for example, evidence regarding how sales personnel were trained), it is not this court's duty to scour without guidance a voluminous record for evidence supporting the government's theory. *Cf. Baum*, 555 F.3d at 1132 (when an argument would require appellate court "to scan volumes aimlessly in a search for what was established at trial, [i]t may well be within our power as a court to refuse to consider [the] argument" (citation and internal quotation marks omitted)). Accordingly, we reverse Mr. Schmidt's convictions on counts 12, 13, 14, and 18.

Schmidt also contends that there was insufficient evidence to support his conviction on count 20—a charge of securities fraud with respect to an investment by Shirley Lehr. His opening brief on appeal devotes one sentence to his substantive argument: "Because Lehr did not testify at trial, there was no evidence presented that there was fraudulent conduct in connection with her investment." Schmidt Br. at 60–61. But Lehr's investment file was introduced as evidence at trial. And it suffices to show that she was deceived regarding her investment. We are aware of no doctrine requiring that fraud be proved by testimony of the victim.

We reject Schmidt's argument that the evidence cannot sustain his conviction on count 20.

### 2. Schmidt's 330-year Sentence

Schmidt received an unusually long sentence of 330 years' imprisonment. He contends that his sentence is both procedurally and substantively unreasonable. He argues that his sentence is procedurally unreasonable because the district court (1) improperly translated the guidelines-recommended life sentence into a 330-year sentence; (2) presumed that the guidelines sentence was reasonable in rejecting his request for a 25-year sentence; (3) did not adequately consider whether there would be an unwarranted disparity between his sentence and the previously imposed sentences of similar defendants; and (4) failed to consider his age and health at the time of sentencing. He argues that his sentence is substantively unreasonable because it is longer than necessary to achieve the purposes of sentencing. We reject his arguments. We note that because we have set aside his convictions on four counts, his sentence will be reduced to 310 years. But this reduction does not affect our analysis.

### a. Procedural Error

We first address Schmidt's argument that the guidelines sentence of life imprisonment was improperly translated into a sentence of 330 years' imprisonment. He does not dispute that a proper calculation under the guidelines leads to an advisory sentence of life imprisonment. Assuming the propriety of

that guidelines sentence, we fail to see how Schmidt can complain of being sentenced to any term of years—after all, as a practical matter the longest that he can be incarcerated is for the rest of his life. None of the offenses of which Schmidt was convicted carries a life sentence, so he could not have been formally sentenced to life. In that circumstance it was eminently reasonable for the district court to impose a sentence functionally equivalent to life imprisonment by imposing the maximum sentence for each crime of which Schmidt was convicted and making the sentences consecutive. *See United States v. Sarras*, 575 F.3d 1191, 1208–09 (11th Cir. 2009) ("Because the statutory maximum [for the count with the highest statutory maximum] was less than the total guidelines punishment of life imprisonment, § 5G1.2(d) of the guidelines called for the sentences for multiple counts to run consecutively as the advisory guidelines sentence."); *United States v. Thompson*, 523 F.3d 806, 814 (7th Cir. 2008) ("The district court thought a life sentence was warranted, and it did not err when it imposed consecutive maximum sentences on each count of conviction to reach an equivalent sentence."); USSG § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."); *id.* § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or

more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

Schmidt also argues that the district court committed procedural error by giving too much weight to the advisory guidelines range when it rejected his request for a 25-year sentence. He bases this claim on the court's response to his request. The court stated that the requested sentence was a "major deviation and variance" from the guidelines range and that Schmidt would therefore have to support it with "significant justification." Schmidt R. Vol. 58 (Schmidt Sentencing Hr'g Tr.) at 51–52. Finding that justification lacking, the court denied Schmidt's request. On appeal he has not shown the denial to be error. The Supreme Court has cautioned district courts "that a major departure should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38, 50 (2007). Yet Schmidt has not argued either that he gave a significant justification for his requested variance or that his requested variance was not major. To the extent that Schmidt is contending that the district court's statement indicated that it was presuming the reasonableness of a guidelines sentence, he is mistaken. The court never said that it was applying such a presumption, and its oral statements at sentencing reflected a careful consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

Schmidt next contends that the district court did not adequately consider whether its sentence would create an "unwarranted sentence disparit[y] among

defendants with similar records who have been found guilty of similar conduct."

18 U.S.C. § 3553(a)(6). He provided the court with a document describing the

sentences of 28 defendants convicted of financial crimes. The document provided

only the defendants' names, their offenses, and their sentences. The court found

this "anecdotal evidence" too undeveloped to enable it to perform a fair

"comparative analysis" of the sentences. Schmidt Sentencing Hr'g Tr. at 49. We

agree. As we have stated, "§ 3553(a)(6) requires a judge to take into account

only disparities . . . among defendants *with similar records and Guideline

calculations*." *United States v. Verdin-Garcia*, 516 F.3d 884, 899 (10th Cir.

2008) (emphasis added). Schmidt failed to provide information about the

comparison-defendants' offense levels or criminal histories, not to mention

information about the specifics of their offenses, such as the number of victims,

whether the victims were particularly vulnerable, or the defendant's role in the

criminal scheme. The district court could not have determined from Schmidt's

evidence whether the comparison-defendants were similar or dissimilar to him.

Finally, Schmidt argues that the district court did not "carefully consider"

his age (he was 72) and health at the time of sentencing. Schmidt Br. at 22. He

does not persuade us that there was any error. The court expressly declined to

vary from the advisory guidelines range based on Schmidt's age and health,

correctly noting that the guidelines specifically discourage consideration of a

defendant's age unless the defendant is infirm (which Schmidt was not), *see*

-11-

USSG § 5H1.1,[1] or of a defendant's physical condition unless the defendant has an "extraordinary physical impairment" (which Schmidt did not), *id.* § 5H1.4.[2] Although district courts "have broad discretion to consider individual characteristics like age[,] . . . [t]hat such a ground for a variance is available certainly does not . . . mean it is compelled." *United States v. Sells*, 541 F.3d 1227, 1238 (10th Cir. 2008).

### b. Substantive Error

Schmidt contends that his sentence is substantively unreasonable because it is longer than necessary to achieve the purposes of sentencing. We review a claim of substantive unreasonableness for abuse of discretion. *See id.* at 1237. "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (internal quotation marks omitted). Because Schmidt's sentence was within the properly calculated guidelines range, it is presumed reasonable. *See United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006). The defendant may rebut the presumption, however, "by

---

[1]USSG § 5H1.1 provides that age "is not ordinarily relevant in determining whether a departure is warranted. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."

[2]USSG § 5H1.4 provides that physical condition "is not ordinarily relevant in determining whether a departure is warranted. However, an extraordinary physical impairment may be a reason to depart downward, *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

demonstrating that the sentence is unreasonable when viewed against the other factors delineated in § 3553(a)." *Id.*

Schmidt argues that his sentence is substantively unreasonable because it is longer than necessary to effectuate the purposes of sentencing. Those purposes are set forth in § 3553(a), which lists the factors a sentencing court must consider when imposing sentence. Schmidt points only to some of the factors enumerated in § 3553(a)(2): "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; . . . to afford adequate deterrence to criminal conduct; . . . [and] to protect the public from further crimes of the defendant." He argues that his requested 25-year sentence would have been appropriate under these factors. But a reasonable sentencing judge need not give equal weight to all factors. The heinous nature of the offense in itself can justify a harsh sentence. That was the situation here. The substantive reasonableness of the sentence is fully explained by the following excerpt from the district court's comments at sentencing:

> This defendant did not simply steal money from the rich in Robin Hood like fashion, he stole money from the elderly, the infirm and the disabled. The victim letters attached to the pre-sentence report indicate clearly that he ruined many people's lives by defrauding them of their life savings. Tellingly, he and his wife went so far as to drive a victim with multiple sclerosis to the bank to get a second check from him.
>     . . . .
>     These are serious offenses that, when considered with relevant conduct, have had adverse, long-lasting and life changing, ruinous consequences on hundreds of victims and the defendant [sic].

-13-

> Innocent people have been traumatized. Lives have been ruined. Life savings of hard-working, decent men and women have been lost. The victims of this defendant's criminal conduct are numerous and include the elderly, the infirm, and even the disabled.
>
> [T]he losses are staggering, amounting to more than $43,000,000. Deterrence, especially of those similarly situated or inclined, can only be effected through lengthy incarceration, protection of the public through life-long incapacitation, through incarceration for life, is necessary.

Schmidt Sentencing Hr'g Tr. at 51, 54. We hold that Schmidt's sentence was substantively reasonable.

### 3. Alleged Denial of Fair Trial/Failure to Order Disclosures and Admission of Alleged Hearsay

Schmidt claims that several of the district court's rulings deprived him of his right to a fair trial. We first discuss his complaints of failures by the court to order disclosures by the government. We then address his hearsay claim.

### a. Failure to Order Disclosures

The indictment concerned the activities of seven coconspirators spanning five years. The documentation of their activities included more than two million pages. The time for trial preparation and for the trial itself were likewise extensive. Schmidt was indicted on March 10, 2004, and a superseding indictment was filed in September 2005. The trial began on Wednesday, April 4, 2007, and proceeded at a four-day-a-week pace (except for one day because of a juror injury) until the close of evidence on May 9. Sixty-three witnesses testified for the government and 14 for the defendants (although neither Schmidt nor Lewis

-14-

called any witnesses). Schmidt contends that in a case of this magnitude, fairness required the district court to assist his trial preparation by ordering early disclosure of boxes of bank records, witness lists, exhibit lists, and a government database used to organize financial information in the case.

### (i)     Boxes of Bank Records

On the first day of trial, April 4, 2007, the government brought into the courtroom 16 boxes of bank records documenting the transactions and accounts on which it planned to build its case. Twelve days before trial the government had notified the defendants that it intended to authenticate the records by using the certification process under Fed. R. Evid. 902(11). Rule 902(11) permits a party to establish the authenticity of documents as domestic business records through a declaration from the records' custodian. The party must, however, "make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." Fed. R. Evid. 902(11).[3] Attached to the government's notice

---

[3]Fed. R. Evid. 902 states:

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

. . .

(11) Certified Domestic Records of Regularly Conducted Activity. The original or duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by a written declaration of its

(continued...)

-15-

was a list of the exhibits it intended to introduce and declarations from the records' custodians certifying the records.

Schmidt responded to the notice with a number of challenges. A few days into trial, on April 9, he filed an objection arguing, among other things, that the government did not provide enough time to inspect the records, or to locate and interview the declarants. The government responded that it had made the originals of the records available to Schmidt since 2004, and that on one occasion before September 2005 an investigator working for Schmidt had reviewed the records. The government further noted that the actual records had also been available to Schmidt in the courtroom since trial began, but that he had never requested to review them. Finally, the government argued that Schmidt had been

_____

[3](...continued)
custodian or other qualified person, in a manner complying with any Act of Congress or rule prescribed by the Supreme Court pursuant to statutory authority, certifying that the record—

    (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    (B) was kept in the course of the regularly conducted activity; and

    (C) was made by the regularly conducted activity as a regular practice.

    A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

provided sufficient time to locate and contact the declarants because it had given him their addresses on March 2, 2007, more than a month before Schmidt filed his objection. Schmidt has not disputed the government's factual assertions. On April 16 the court overruled Schmidt's objections, deciding that the government had complied with Rule 902(11).

On April 20 Schmidt filed an objection to the court's April 16 order. He argued that although he had taken two hours since trial began to review some of the records, it would take "at least 20 hours of counsel time" to review them all, and that "fairness should have required that these exhibits be made available substantially before the eve of trial." Schmidt R. Vol. VII, Doc. 1134 at 2.

Finally, when the government moved to admit some of the boxed records on April 30, Schmidt orally repeated this objection and requested a two-day continuance or exclusion of the records. The government responded that (1) it had provided electronic copies of the records to Schmidt in June 2004; (2) the original records had been available for inspection in the U.S. Attorney's Office since 2004; and (3) the original records were available for inspection when it filed its Rule 902(11) notice on March 22, 2007. The court overruled Schmidt's objections and admitted the records.

On appeal Schmidt contends that the district court abused its discretion in admitting the bank records and in denying his request for a continuance because he had not been afforded adequate time to examine the records. We review for an

abuse of discretion both the district court's decision to admit evidence and its denial of a continuance. *See United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006) (admission of evidence); *United States v. Pursley*, 577 F.3d 1204, 1227 (10th Cir. 2009) (denial of continuance).

We see no abuse of discretion here. Although Schmidt contends that he had only "the weekend before trial" to examine the boxed records, Schmidt Br. at 34, the records themselves had been available to him since 2004. His investigator had even examined the records by September 2005, more than 18 months before trial, and Schmidt had obtained electronic copies of the records long before trial. Although the records may not have been organized as they were when introduced at trial, he could not have been surprised by their contents. And Schmidt had 39 days (from the time of the government's Rule 902(11) notice until its introduction of the records at trial) to inspect them precisely as they would be introduced, but he devoted only two hours to that task. The district court acted well within its discretion in admitting the records and denying a continuance.

### (ii)    Witness List

On April 26, 2006, the government offered to exchange nonbinding witness lists with Schmidt in December 2006—four months before trial. A week later Schmidt requested that the government provide its list before December and objected to providing a witness list himself, but said that he would abide by an order from the court. On May 11, 2006, the court rejected Schmidt's objections

and ordered the parties to disclose a list of witnesses (identified as "will-call" witnesses whom the party would be calling to testify and "may-call" witnesses whom the party may call) by the first trial-preparation conference, which was scheduled for March 2, 2007. At the March 2 conference the parties exchanged witness lists and the court ordered the parties to file updated lists by March 30, five days before trial.

Schmidt complains that delayed disclosure of the witness lists prejudiced his preparation for trial. As he concedes, however, there is no constitutional or statutory right to pretrial disclosure of witness lists in noncapital criminal cases. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 451 (10th Cir. 1984). Moreover, he has failed to explain how he was prejudiced. The government witnesses were easily predictable—investors, government agents to summarize financial transactions, representatives of the insurance companies that were purportedly insuring the investments, etc. Schmidt has not pointed to a single witness as having been a surprise at trial, nor has he shown why he could not have sought a continuance had he been confronted with an unexpected witness.

### (iii)    Exhibit List

In October 2004, about two-and-a-half years before trial, Schmidt asked the district court to order the government to designate the documentary evidence that it would be using at trial. He contended that he could not fulfill his duty under

Fed. R. Crim. P. 16(b)(1)(A)[4] to disclose the documents that he intended to use at trial unless he first knew what documents the government intended to use. The government opposed this request, arguing that it had already provided Schmidt with access to every item in its possession and that it was not sure which items it would be using at trial. Sixteen months later the court ordered the parties to have a set of exhibits available by the first day of trial.

Schmidt challenges the court's failure to order earlier disclosure of an exhibit list. But, as with the witness list, he concedes on appeal that no statute or rule of criminal procedure entitled him to such a list before trial. And despite his assertion to the contrary, we see no evidence of prejudice. What is most important to trial preparation is not a *list* of documents but the availability of the documents themselves. And Schmidt has not suggested that the government used

---

[4]Fed. R. Crim. P. 16(b)(1)(A) provides:

If a defendant requests disclosure under Rule 16(a)(1)(E) [of records controlled by the government that it intends to use at trial, that were obtained from the defendant, or that are material to the preparation of the defense] and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if:

> (i)    the item is within the defendant's possession, custody, or control; and

> (ii)    the defendant intends to use the item in the defendant's case-in-chief at trial.

at trial any documents that had not been disclosed to him well before trial. He has utterly failed to explain how the absence of an exhibit list prejudiced him.

### (iv) The Government's Financial Database

Using the bank records, the government created a computer database detailing the activity in some 170 accounts. The database of checks, wire transfers, deposits, and the like contained over 15,500 items. By making queries of the database, government agents were able to prepare summary exhibits for presentation to the jury. These exhibits were made available to Schmidt 10 days before trial. On April 20, 16 days after trial began and 10 days before the exhibits were to be shown to the jury, Schmidt filed a motion seeking access to the database and the queries made of it. He argued that he could not "adequately review the summary exhibits to determine their accuracy, completeness and fairness without access to the underlying source material." Schmidt R. Vol. VII, Doc. 1135 at 2. The district court denied his motion. It explained that the "underlying source material" was the bank records themselves, which had been available to Schmidt since June 2004, and that the database was undiscoverable because it was government work-product under Fed. R. Crim. P. 16(a)(2), the first sentence of which states:

> Except as Rule 16(a)(1) [relating to oral statements by the defendant to government agents] provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the

government or other government agent in connection with investigating or prosecuting the case.

The summary exhibits were presented through the testimony of IRS Agent Wayne Stockley. After cross-examining Stockley, Schmidt again requested access to the database. The district court denied the request.

On appeal Schmidt argues that the district court should have ordered disclosure of the government's database. He concedes that Rule 16(a) did not require pretrial disclosure. *See United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir. 1988) ("[I]nternal government documents made in connection with a prosecution are exempt from discovery."); *United States v. Robinson*, 439 F.3d 777, 779–80 (8th Cir. 2006) (defendant in tax-evasion prosecution could not discover "internal documents used by the government to calculate gross receipts, business expenses and taxes owed," even though the defendant's lack of those documents may have "made trial preparation extremely difficult." (internal quotation marks omitted)). But he argues that once the government presented the summary charts, disclosure of the database was mandated by Fed. R. Evid. 1006, which requires a party offering a summary exhibit to make available to the opposing party the underlying records summarized in the exhibit.[5] This mandate,

---

[5]Fed. R. Evid. 1006 states in full:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be

(continued...)

-22-

he contends, overrides the work-product privilege under Rule 16(a)(2) because presentation of the summary exhibits constituted a waiver of the privilege.

We disagree. Rule 1006 did not require disclosure of the government's database. Although that rule entitles the defendant to review the documents summarized in an exhibit, the database served only as an aid in preparing the summary—allowing the government to perform calculations from the bank records. The underlying documents in this case are not the database but the bank records themselves. The purpose of requiring the party offering a summary to make the underlying documents available to the opposing party is to enable the opposing party to check the accuracy of the summary. Access to the offering party's worksheets or database may make it easier for the opposing party to perform that check; but so long as the opposing party is given sufficient time to inspect the underlying documents, there is no reason to give the opposing party the benefit of the offering party's labor in preparing such worksheets or database. Here, Schmidt had ample time to inspect and review the bank records so that he could challenge any inaccuracy in the summaries. As stated above, the government made these bank records available for examination well before trial; and all the records used to construct the summary exhibits had been admitted into

---

[5](...continued)
made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

evidence. Rule 1006 therefore had been satisfied. Because the database was not subject to disclosure under Rule 1006, there is no need to determine whether disclosure would otherwise be barred by the Rule 16(a)(2) work-product privilege.

### b. Alleged Coconspirator Hearsay

Fed. R. Evid. 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Schmidt contends that the district court improperly admitted hearsay testimony under this provision without first conducting an evidentiary hearing at which the court would have to find the necessary factual predicates. He also complains that the court admitted testimony about many statements by alleged coconspirators to victims on the ground that they were offered for the nonhearsay purpose of showing the effect on the listener; he argues that the statements were improperly used as substantive proof of the scheme to defraud. We reject Schmidt's contentions. Apparently misunderstanding what hearsay is, he fails to point to any hearsay that was admitted by the court. Absent a showing that the court admitted hearsay evidence, there was no need for any finding (after an evidentiary hearing or otherwise) that the requirements of Rule 801(d)(2)(E) had been satisfied. *See United States v. Cesareo-Ayala*, 576 F.3d 1120, 1128 (10th Cir. 2009).

We begin by briefly explaining what hearsay is and what it is not. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). It is essential to understand that "the matter asserted" is the fact being asserted by the declarant in uttering the statement. That is not necessarily the matter that the party offering the statement into evidence is trying to prove with the statement. For example, a party may offer a statement by *A* that the Yankees won the pennant in 1999. The matter asserted by *A* is that the Yankees were American League champions in 1999. But if the party offering *A*'s statement is merely trying to prove that *A* was capable of speech, then *A*'s statement is not offered into evidence for the truth of the matter asserted, and the statement is not hearsay.

In general, hearsay is inadmissible. *See id.* R. 802. But not always. There are a number of exceptions to the hearsay rule. *See id.* R. 803, 804. In addition, the Rules of Evidence label as nonhearsay some statements offered for the truth of the matter asserted; for example, Rule 801(d)(2) treats as nonhearsay certain statements that can be legally ascribed to the party against whom they are offered. Among such statements are those by a coconspirator "of a party [made] during the course and in furtherance of the conspiracy." *Id.* R. 801(d)(2)(E).

With this background, we turn to Schmidt's argument. Before trial the government submitted a proffer that certain statements satisfied Rule

801(d)(2)(E).  The district court, without holding a hearing, but after examining lengthy pleadings by the parties, determined that the proffer satisfied the government's burden by a preponderance of the evidence, and it ruled that the statements, other than some listed exceptions, were "ostensibly admissible." Suppl. Schmidt R., Doc. 441 at 10.  Schmidt asserts that the district court should not have ruled on admissibility without conducting an evidentiary hearing and that in any event the ruling did not address all the statements ultimately admitted at trial as coconspirator hearsay.

Schmidt is not entitled to relief, however, unless he can point to hearsay evidence improperly admitted at trial.  This he has failed to do.  His first example of allegedly improper testimony is that of a potential investor, Linden Markham. Although his brief discusses that testimony only in general terms, quoting just one sentence, we provide all her relevant testimony, italicizing the portion quoted:

> Q      And what do you recall about that discussion?
> A      [Lewis] made some allusions in conversations to having been part of an investment program that had very handsome returns.
> Q      And did he describe those returns to you in any specifics during this conversation?
> A      Well, they sort of ranged in value.  He was talking about, you know, ten percent.  I originally thought ten percent per year but he meant ten percent per month to 1600 percent per month.
> . . . .
>
> Q      At some point or another, did Mr. Lewis become more specific with you about this investment?
> A      He did. . . . .  He was talking about an investment that was a private program that traded medium-term notes.  That it was — an[] international program.  That some it — that it had been in

-26-

existence for a while, different variations on this program. That it had been sponsored by the Reserve Foundation Trust, and that one of the directors had been a former director of the World Bank.

Q    Did he mention a name?
A    Peter Moss.
Q    Let me back up a second. With respect to this investment, did he mention any other persons who were in fact managing this investment opportunity?
A    *That's when he mentioned Norman Schmidt to me.*
Q    And what did he say about Mr. Schmidt?

[Schmidt's attorney]: Your Honor, I am going to make that standard objection that this is hearsay, and I will just leave it at that.
The Court: Very well. Overruled on the basis of 801(d)(2)(E).

[Prosecutor then modifies question to Markham, but Markham's answer is stricken as improper opinion testimony.]

Q    Ms. Markham, do you remember any specific statements Mr. Lewis made to you concerning Mr. Schmidt's relationship to this investment?
A    Mr. Lewis told me that Mr. Schmidt had been involved in several investments of this nature over a period of time.
Q    And did he make reference to how successful those investments had been?
A    He said that they had been very successful, and that's why it was an ongoing thing.

Schmidt R. Vol. XXVII, Trial Tr. at 1321–25.

Schmidt may be correct that the district court never made findings necessary to admit under the coconspirator rule these statements by Lewis about Schmidt. But the evidence would be admissible anyway if it was not offered for the truth of the matters asserted by Lewis. *See Cesareo-Ayala*, 576 F.3d at 1128 (declining to address defendant's argument that coconspirator statements were

-27-

improperly admitted under Rule 801(d)(2)(E) because they were admissible as nonhearsay statements not offered for the truth of the matters asserted). That is the situation here. Markham's testimony about what Lewis told her was not offered for the truth of the matters asserted by Lewis. Indeed, the government's theory in offering the testimony was that Lewis's statements were in fact untrue. The government was trying to prove that Lewis made false statements to prospective investors. And most of the matters asserted by Lewis were false: for example, Markham testified that Lewis had told her that the investment program traded in medium-term notes (it did not) and that one of the program's directors had been a former director of the World Bank (he had not). It is irrelevant that Lewis's statements to Markham were used substantively—as evidence that Markham was defrauded. The hearsay rule does not preclude an out-of-court statement from being used substantively so long as it is not being used to prove the truth of the matter asserted by the declarant.

We recognize that in district court the government did not argue that the testimony challenged on appeal was not hearsay. Although on a number of occasions during trial the government argued that statements by coconspirators were not being offered for the truth of the matter asserted, on this occasion the court ruled before the government could have spoken. In any event, we may still affirm on this ground because it is established by the record and doing so is fair to Schmidt. *See id.* at 1128 n.2. The testimony is clearly not hearsay and

-28-

Schmidt cannot present facts that would change our analysis. Moreover, Schmidt's reply brief does not challenge the government's right to make this argument. *See id.* ("Given the absence of any possible factual dispute, the clarity of the issue, and the failure of Mr. Cesareo-Ayala to argue that the delay in raising the issue has prejudiced him in responding on appeal, we see no unfairness in affirming on this ground.").

Schmidt also argues that other hearsay statements were improperly admitted under the coconspirator rule. But he does not adequately present this argument. Determining whether a coconspirator's statement is being offered for the truth of the matter asserted often requires careful consideration of both the context of the statement in the coconspirator's conversation and the relevance of the statement to the trial. Schmidt's opening brief, however, does not even hint at these matters. For most of his claims he merely notes the names of witnesses who allegedly testified to inadmissible statements and provides page citations to the record tied to each witness. He apparently invites us to examine each statement on the cited pages to determine whether it was in fact hearsay and, if so, whether its admission was prejudicial. We decline his invitation. We will save our resources for properly framed arguments. *See United States v. LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001). And for those hearsay claims for which he provides slightly more information, he still neglects to point to a single statement as having been offered for the truth of the matter asserted by the declarant. He seems to

think that it was enough to refer to a statement by an out-of-court declarant that was used to establish his guilt. As we have already explained, however, that does not suffice to show that the statement was hearsay.

We note that Schmidt's reply brief appears to argue in addition that even if statements by alleged coconspirators were not offered for the truth of the matter asserted, they were still not admissible absent a court finding that the speaker was a coconspirator. But this is a relevance issue, and Schmidt fails to point to any objection by him at trial that challenged relevance. In any event, we generally do not address issues raised for the first time in a reply brief. *See United States v. Redcorn*, 528 F.3d 727, 738 n.4 (10th Cir. 2008).

### c. Due Process

Finally, Schmidt argues that even if the district court's rulings on government disclosure and hearsay may have been correct when viewed in isolation, their combined effect in "a case as large and complicated as the one at issue," Schmidt Br. at 27, was to deny him the fair trial guaranteed by the right to due process. He complains of "[h]olistic fundamental unfairness" at trial, *id.*, relying on our statement in *United States v. Rivera*, 900 F.2d 1462, 1477–78 (10th Cir. 1990) (en banc), that "prejudicial circumstances, which do not individually constitute error, might contribute to or cause a finding of fundamental unfairness." But *Rivera* further said that "[c]ourts should tread gingerly when faced with arguments concerning the 'fundamental fairness' component of the

-30-

Fifth Amendment's Due Process Clause, which should be reserved for the most serious cases, which truly shock the conscience as well as the mind." *Id.* at 1477 (internal quotation marks omitted). Because we have rejected each of Schmidt's objections individually and none of the challenged rulings improperly prejudiced him, the conscience of the court is at peace, and we deny his due-process claim.

### B. Lewis's Issues

#### 1. Hearsay

Like Schmidt, Lewis complains of the improper admission of evidence under the coconspirator exception to the hearsay rule. We reject his complaint because he has not properly presented the issue on appeal.

Lewis failed to identify in his opening brief any specific statements that were allegedly admitted improperly. He provided only an unadorned paragraph of citations to the record. This is inadequate because he does not "connect any of these cites to specific evidence he claims was prejudicial." *United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997). Although he attempts to do better in his reply brief, arguments made for the first time in the reply brief are untimely. *See Redcorn*, 528 F.3d at 738 n.4. An appellant cannot hold his specific complaint in reserve until it is too late for the appellee to respond.

#### 2. Alleged Amendment of the Indictment

-31-

Lewis contends that a jury instruction improperly amended the indictment by permitting the jury to convict him of aiding and abetting the alleged conspiracy. He has not argued that there is no such offense as aiding and abetting a conspiracy, and we do not address the issue. *See United States v. Willis*, 890 F.2d 1099, 1104 (10th Cir. 1989) (upholding a jury instruction charging defendant with aiding and abetting a conspiracy); *United States v. Oreto*, 37 F.3d 739, 751 (1st Cir. 1994) ("[I]t appears that most if not all courts to consider the issue have held that a defendant may be convicted of aiding and abetting a conspiracy."). Rather, he is asserting that the challenged instruction was improper because the offense is not charged in the indictment. He bases this assertion on the absence in the conspiracy count of any aiding-and-abetting language or even a citation to 18 U.S.C. § 2, the aiding-and-abetting statute.

Lewis's argument fails. This circuit's law is settled that the trial court can give an aiding-and-abetting instruction, and the jury can convict on that theory, even if the indictment does not allege aiding and abetting. *See United States v. Alexander*, 447 F.3d 1290, 1298 (10th Cir. 2006). As we stated in *United States v. Cooper*, 375 F.3d 1041, 1049 (10th Cir. 2004),

> [I]t is well established that aiding and abetting is not an independent crime under 18 U.S.C. § 2; it simply abolishes the common-law distinction between principal and accessory. Consequently, a defendant can be convicted as an aider and abettor even though he was indicted as a principal for commission of the underlying offense and not as an aider and abettor, providing that the commission of the underlying offense is also proven.

-32-

(brackets, citations, and internal quotation marks omitted).  As an aside, we note that reading the jury instructions as a whole, we think it highly unlikely that the jury understood the aiding-and-abetting instruction as relating to count 1 (the conspiracy count) and convicted him under that theory.  *See* Jury Instructions, Doc. 1219, No. 36A ("the government has advanced three theories [the second of which was aiding and abetting] of prosecution concerning Counts 2-10 and 12-29.").

### 3.    *Franks* **Hearing**

An affidavit does not provide probable cause to support a search warrant if the affiant intentionally or recklessly asserted material falsehoods.  *See Franks v. Delaware*, 438 U.S. 154, 164–65, 168 (1978).  Under *Franks* a district court must hold a hearing to explore the sufficiency of the affidavit if the defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant" and that "the allegedly false statement [was] necessary to the finding of probable cause." *Id.* at 155–56.

Lewis complains that the district court refused to conduct a *Franks* hearing in connection with his motion to suppress evidence obtained by executing a search warrant for a business office.  He contends that the affiant failed to "disclose that she had little direct basis for the claim [in the affidavit] that the

internal workings of the . . . office . . . was understood by" a confidential

informant.  Lewis Br. at 26.

But Lewis has never asserted, before this court or in the district court, that

the affiant intentionally or recklessly made false statements.  Thus, a *Franks*

hearing would have been improper.

Lewis argues to us that he could not have filed an affidavit alleging that the

affiant lied because doing so would have prejudiced his "rights against self-

incrimination."  *Id.* at 26–27.  But he never raised this argument in the district

court; and even in this court he does not say what he could have sworn to in such

an affidavit.  Moreover, we question whether an affidavit submitted in support of

a motion to suppress could be used against a defendant at trial.  *See Simmons v.*

*United States*, 390 U.S. 377, 389–94 (1968) (defendant's testimony at suppression

hearing to establish standing to object to a search cannot be used against him at

trial to establish guilt because defendant need not choose between his Fourth and

Fifth Amendment rights).  Accordingly, we are unpersuaded that he should be

excused from making the necessary showing in district court.

### 4.    Sentencing

Lewis's offense level was calculated as follows:  His base offense level was

7 under the guideline for fraud offenses.  *See* USSG § 2B1.1(a)(1).  That level

was increased to 40 because of the following enhancements:  (1) 22 levels based

on an actual loss of $24,709,954, *see id.* § 2B1.1(b)(1)(L); (2) 6 levels based on

the number of victims (1,169), *see id.* § 2B1.1(b)(2)(C); (3) 2 levels based on a violation of a prior Nebraska cease-and-desist order, *see id.* § 2B1.1(b)(8)(C); (4) 2 levels because the offense involved sophisticated means, *see id.* § 2B1.1(b)(9)(C); and (5) 1 level because he was convicted of money laundering under 18 U.S.C. § 1957, *see id.* § 2S1.1(b)(2)(A). His six criminal-history points placed him in criminal-history category III, resulting in an advisory guidelines range of 360 months to life. *See id.* Ch. 5, Pt. A. The court sentenced him to 360 months' imprisonment. Because none of his convictions carried a maximum sentence as long as 360 months, the court ran his sentence on the money-laundering count consecutively to his concurrent sentences on the other counts. *See id.* § 5G1.2(d).

Lewis contests (1) the two-level enhancement based on a violation of the Nebraska cease-and-desist order; (2) the court's loss calculation; and (3) the imposition of consecutive sentences.[6]

### a. Nebraska Cease-and-Desist Order

Under USSG § 2B1.1(b)(8)(C) the offense level for a fraud offense must be increased by two if the offense involved "a violation of any prior, specific judicial

---

[6]The summary of the district-court proceedings in Lewis's opening brief could be read as stating that the court improperly assumed the reasonableness of the guidelines when it imposed sentence. But the matter is not discussed in the portion of the brief entitled "Legal Discussion," and the brief does not include a sufficiently developed argument to require our attention. In any event, it appears to us that the court's reference to the guidelines was appropriate.

or administrative order." The district court imposed this enhancement because some transactions in the Ponzi scheme violated a cease-and-desist order issued by the Nebraska Department of Banking and Finance. The order was issued on March 12, 2002, after Lewis and Jannice McLain, Schmidt's then-girlfriend and later wife, solicited an investment from a Nebraska resident, Warren Peterson, in Smitty's, one of the scheme companies. No Smitty's security was registered in Nebraska, and Smitty's itself was not registered with Nebraska as a securities dealer. The order prohibited "Smitty's . . . , its affiliates, controlling persons, officers, directors, agents, employees and successors, and any person or entity directly or indirectly controlled or organized by or on their behalf" from soliciting any investments in "securities until the securities have been registered with the [Nebraska Department of Banking and Finance]," and further prohibited those individuals and entities from "offer[ing] and s[elling] . . . securities until they have been registered as broker-dealers or agents with the [Nebraska Department of Banking and Finance]." Schmidt R. Vol. V, Doc. 621, Attach. 20. Despite the order, McLain and others—but not Lewis—continued to solicit investments in Nebraska.

In the district court Lewis opposed the two-level enhancement on the ground that the *violation* of the order was not foreseeable. His argument on appeal is different. He now argues that the enhancement should not apply

-36-

because he did not have knowledge of the order. Because Lewis did not raise this issue below, we review only for plain error. *See United States v. Burke*, 571 F.3d 1048, 1057 (10th Cir. 2009) ("[W]hen a defendant pursues a particular theory or objection, but fails to raise another closely related argument, he has forfeited the argument and we review only for plain error."). On plain-error review we will reverse the district-court judgment "only if [(1)] there is . . . error, (2) [the error] is plain, . . . (3) [the error] affects substantial rights, and . . . (4) [the error] seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

We will assume, without deciding, that the enhancement under § 2B1.1(b)(8)(C) cannot be imposed unless the defendant knew that the order had been issued. Based on that assumption, it is possible that the district court erred in imposing the enhancement because it never explicitly found that Lewis knew that the order existed. But we can reverse under plain-error review only if it is clear that imposition of the enhancement was error. It is not enough that a hearing on remand *may* show that the enhancement was improper. If that were all that is required, we could reverse and remand because of "plain error" even though it may ultimately be resolved that there was no error at all. Such a fruitless, wasteful procedure is not the office of plain-error review. Recognizing this, we have stated that "factual disputes [regarding sentencing] not brought to

the attention of the [district] court do not rise to the level of plain error." *United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998). At most, we could recognize an exception to this general rule when the appellant can establish the certainty of a favorable finding on remand. Perhaps Lewis might then prevail on this issue if he could establish that the government would be unable to prove that he knew of the order. It would be remarkable if Lewis could meet that burden, and he has not done so.

We need point to only a few items of evidence suggesting that he would have been informed of the order. First, Lewis was one of those whose actions precipitated the cease-and-desist order. He and McLain personally solicited Peterson, the Nebraska investor who alerted the Nebraska Department of Banking and Finance to potential irregularities with Smitty's. Second, although he claims that his role was limited to that of manager of Capital Holdings's office in Denver, he took part in the activities of the other scheme companies (such as by soliciting Smitty's investments) and apparently had a special role in dealing with government investigations. A Capital Holdings employee testified that when Lewis was told that an investor in the Northwest Group (one of the scheme companies) had caused the Securities and Exchange Commission (SEC) to investigate Northwest, Lewis responded that the investigation "would ruin everything," Lewis R. Vol. XVII at 2688, and he ordered that the investor and

anyone whom he had brought into the scheme be reimbursed for their investments. Thus, there is good reason to believe that Lewis knew of the Nebraska order. In any event, he has hardly satisfied his burden of establishing that the government would be unable to prove on remand that he knew of it.

### b. Loss Calculation and Attribution

Lewis's offense level was increased by 22 levels based on the district court's finding that the losses from his offenses were $24,709,954.02. He challenges the district court's loss calculation on five grounds. One can be disposed of summarily. He argues that the court could not consider evidence of losses caused by conduct of which he had been acquitted. But binding precedent holds otherwise. *See United States v. Watts*, 519 U.S. 148, 154 (1997) ("[W]e are convinced that a sentencing court may consider conduct of which a defendant has been acquitted."); *United States v. Todd*, 515 F.3d 1128, 1137–38 (10th Cir. 2008) (following *Watts*).

Lewis also argues that the district court was required to find that the loss was established by clear and convincing evidence. At sentencing, however, Lewis's counsel stated that the government had to prove losses by only a preponderance of the evidence. Because Lewis did not raise this issue below, we review only for plain error. *See United States v. Brooks*, 569 F.3d 1284, 1289 (10th Cir. 2009). Lewis has not shown that the district court plainly erred. For

-39-

error to be plain, the error "must be clear or obvious under well-settled law." *United States v. Trujillio-Terrazas*, 405 F.3d 814, 818 (10th Cir. 2005) (internal quotation marks omitted). But we have repeatedly held that the sentencing court need find facts only by a preponderance of the evidence, *see, e.g.*, *United States v. Hinson*, 585 F.3d 1328, 1341 n.6 (10th Cir. 2009); *United States v. Tindall*, 519 F.3d 1057, 1063 n.2 (10th Cir. 2008), and no Supreme Court or Tenth Circuit decision says that clear-and-convincing evidence is required.

The remaining three grounds on which Lewis challenges the district court's loss calculation relate to the reliability and sufficiency of the evidence with respect to several components of the calculation. "We review the district court's calculation of loss for clear error. To reverse under this standard requires that, based on the entire evidence, we have a definite and firm conviction that a mistake has been committed." *United States v. Hahn*, 551 F.3d 977, 979 (10th Cir. 2008) (citation and internal quotation marks omitted).

Lewis's first evidentiary challenge concerns the government's reliance on information obtained from the trustee in a civil-forfeiture proceeding initiated to reimburse investors from the assets of some of the defendants and their businesses. He complains that the government witness who testified about investor losses at the sentencing hearing had never spoken with the trustee and the trustee obtained her information only through "mass mailings and 'hot lines.'"

Lewis Br. at 36.  But the purpose of the trustee's inquiries was to obtain documentation to corroborate claims of losses, and Lewis has not challenged the reliability of any documentation received by the trustee.  Moreover, information from the trustee merely supplemented the principal means used by the government to determine losses—the evidence acquired in the criminal investigation.  In our view, Lewis has provided no substantial ground for rejecting the district court's determination that the evidence used by the government was reliable.

Second, Lewis asserts that the loss amount is unreliable because it includes losses suffered by unindicted coconspirators.  This assertion is unfounded.  The amount of loss was calculated as the sum of investor deposits to accounts of scheme companies less the sum of payments to investors from those companies.  Lewis has not identified any improper inclusion in the loss calculation of coconspirator deposits to accounts of scheme companies.  Relying on the government's loss-calculation exhibits, he asserts that the government included deposits by Terry Lorenzen, an investor who actively solicited investments from others.  But Lewis misunderstands the exhibits.  They do not show that Lorenzen's *deposits* were included in the loss calculation; rather, *payments* to Lorenzen were included.  Those payments were treated as funds returned to investors and actually aided Lewis by lowering the net-loss amount.  Lewis has no valid complaint on this score.

Finally, Lewis complains that the loss calculation included losses caused by Schmidt's conduct. He acknowledges that the sentencing court can take into account "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B). He contends, however, that he could not have reasonably foreseen the scope of Schmidt's misconduct. The crux of Lewis's argument is that he only "help[ed] manage the executive office suite in Denver" and so could not have known of the extent of Schmidt's fraud. Lewis Br. at 39. But the record before the district court showed that Lewis played a more extensive role than just managing an office. He solicited investments on behalf of several scheme companies, repeatedly telling potential investors that their investments would be insured against losses and that they would receive enormous gains. Although Lewis claims to have had only little power in the enterprise, he had the authority to determine the ostensible rates of return that investors could receive on their investments and the commissions that investors could receive for referring new investors. An employee of Capital Holdings testified that before any Capital Holdings disbursement to an investor, both Lewis and Schmidt had to sign off on it. And, as discussed above, when Lewis became aware that an investor in one of the other scheme companies had generated an investigation by the SEC, he said that the investigation "would ruin everything," Lewis R. Vol. XVII at 2688, and arranged

-42-

to remove that investor (and those associated with him) from the program. Other investors who asked Lewis too many questions were similarly kicked out of the scheme. The district court did not clearly err in finding Schmidt's conduct reasonably foreseeable to Lewis.

### c.  Concurrent Sentences

Lewis contends that the district court should have sentenced him to concurrent sentences. His sole argument in support of this contention is that the "sentences should have been grouped to be served concurrently as recommended by the probation department." *Id.* at 41. But he is confusing (1) grouping offenses for the purpose of calculating an offense level and (2) imposing concurrent sentences for those offenses. The court, as recommended by the probation department in its PSR, did group Lewis's offenses in calculating his offense level. But then, to achieve a sentence suitable for his offense level and criminal history, it imposed some sentences consecutively, again as recommended by the PSR. Lewis provides nary a hint of error. Accordingly, we affirm the imposition of consecutive sentences.

### 5.  Lewis's Pro Se Brief

Finally, we note the arguments raised by Mr. Lewis in a supplemental pro se brief permitted by this court. He argues that his sentence was too long and

(supported by a posttrial affidavit of Schmidt) that the evidence of guilt was insufficient. We are unpersuaded by either argument.

## III. CONCLUSION

We AFFIRM Schmidt's convictions and sentences except that we REVERSE his convictions and sentences on counts 12, 13, 14, and 18 and remand for imposition of a corrected sentence. We AFFIRM Lewis's convictions and sentence. We DENY all pending motions.