FILED
United States Court of Appeals
Tenth Circuit

April 12, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

PAUL L. SMITH,

       Defendant - Appellant.

No. 10-6039

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:08-CR-00272-C-1)**

---

Mack K. Martin, of Martin Law Office, Oklahoma City, Oklahoma for Defendant-Appellant.

Suzanne Mitchell, Assistant United States Attorney, Oklahoma City, Oklahoma (and Sanford C. Coats, United States Attorney, and Vicki Zemp Behenna, Assistant United States Attorney, on the brief), for Plaintiff-Appellee.

---

Before **KELLY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

    Defendant-Appellant Paul Smith appeals his convictions for embezzlement from an employee benefit plan under 18 U.S.C. § 664 and making false statements to a government agent under 18 U.S.C. § 1001(a)(2). He contends that the

evidence was insufficient to sustain the § 664 convictions and that venue was improper for the false statements convictions. We agree and reverse both convictions.

Background

From 1989 to 2004, Defendant-Appellant Paul Smith served as the executive director of Marie Detty, a private non-profit youth and family service center in Lawton, Oklahoma. Aplt. App. 49, 51-52. Marie Detty received funding from multiple sources, including the Oklahoma Department of Mental Health, United Way, private donations, and federal grants. Id. at 50. As executive director, Mr. Smith was in charge of compiling and managing the budget. Id. at 54. The Board of Directors (the "Board") approved an annual budget. Id. at 110. However, Marie Detty was not always able to pay the budgeted amounts, given the sometimes-uncertain nature of donations and grants as well as rising costs, particularly insurance costs. Id. at 80, 138-40.

Marie Detty had an employee profit-sharing plan (the "Plan"). Id. at 94. The Plan was entirely discretionary; that is, the Board decided on an annual basis whether to contribute to the plan. Id. at 97-98. Although the Board generally contributed to the Plan, on at least one occasion it decided not to fund the Plan. Id. at 227. For fiscal years 2002 and 2003, the Board approved 5% (roughly $171,000) and 3% (roughly $94,000) contributions as part of the operating

budget.  Id. at 68, 117-18, 136.

During both 2002 and 2003, Marie Detty's fiscal director, Donald Hall, made out checks to fund the Plan.  Id. at 119, 137.  However, Mr. Smith directed Mr. Hall to hold the checks.  Id. at 119.  Mr. Hall did so.  Mr. Hall testified that he and Mr. Smith did not make the contributions because Marie Detty did not have adequate funds to cover the checks at that time.  Id.; see id. at 82.  Although there were some federal funds available from the Head Start program, those funds could not be used because the Plan benefitted all employees—not just employees funded by Head Start grants.  Id. at 142.  Mr. Hall testified that he and Mr. Smith intended to make the 2002 and 2003 contributions when they received $350,000 that the Oklahoma Department of Mental Health was, in their view, wrongfully withholding.  Id. at 78, 142.  The $350,000 was part of Marie Detty's operating budget for 2002 and 2003, id. at 78, but although Marie Detty hired a lawyer to obtain the withheld funds, by 2004 the money had not been received.  Id. at 78-79, 142-43.  As of 2004, the contributions approved by the board for fiscal years 2002 and 2003 had not been made.  According to Mr. Hall, the contributions were never made because Marie Detty never received the full amount of money owed to it by Oklahoma.  Id. at 143.

At the end of fiscal year 2002, Mr. Smith directed Mr. Hall to void the outstanding contribution check—which Mr. Hall was holding at Mr. Smith's direction—so that it did not appear as an outstanding obligation in an audit.  Id. at

121. He wrote a new check the next year, which he intended to pay if the Oklahoma funds came in. Id. at 122. The same occurred in 2003—the check was voided before the end of the year, and re-written the next to avoid appearing as an outstanding obligation during the year-end audit. Id. at 121-24.

Mr. Smith never informed the Board that the contributions were not made. Id. at 88. However, he did notify the Board that Marie Detty was having cash-flow issues, and that Marie Detty was not meeting "certain obligations." Id. at 213. In 2004, in response to an inquiry by Head Start, the President of the Board acknowledged that the Plan was not funded during 2002 and 2003 because of difficulties with cash flow. See Aplee. Supp. App. 7-8.

The CPA who audited Marie Detty in 2002 and 2003 testified that Marie Detty was in "adequate financial status" for 2002 and was doing well for 2003, based solely upon an increase in net assets. Aplt. App. 152-53, 159-160. However, she could not testify as to whether Marie Detty was operating within its budget, because she was not provided with budget comparisons, and she offered no opinion as to whether Marie Detty could have made the approved plan contributions. Id. at 159. The President of the Board testified that if she had known the contributions had not been made, she would have done things differently to ensure that the plan was funded. Id. at 175, 177, 195.

During the course of his employment, Mr. Smith suggested that Marie Detty contract with Paradigm Associates, PA to provide administrative support or

-4-

consulting services.  Id. at 130, 178.  The Board agreed, and the President signed

a contract under which Marie Detty paid Paradigm $2,000 per month.  Id. at 130,

146-47.  Mr. Smith signed the contract on behalf of Paradigm, and the contract

contained a paragraph explicitly disclosing that Mr. Smith had a financial interest

in Paradigm.  Id. at 146-47, 177-80.  However, Mr. Smith assured the Board that

he would not receive direct financial benefit from the contract.  Id. at 210.

Marie Detty honored its contract to Paradigm, and made the required

monthly payments during fiscal years 2002 and 2003.  Id. at 130.  At trial, the

government presented evidence that the checks issued to Paradigm were deposited

directly into an account over which Mr. Smith exercised sole control, and that

Paradigm was a shell company that had no employees and performed no services.

Id. at 216-17, 251-52.

A.    Investigation and Indictment.

At some point, Marie Detty's new financial director noticed that the checks

issued to Paradigm were deposited in the same account as Mr. Smith's paychecks.

Id. at 216.  An investigation ensued, and Mr. Smith resigned and moved to

Minnesota.  As part of a federal investigation, an FBI agent flew to Minnesota to

interview Mr. Smith.  Id. at 260.  During that interview, Mr. Smith stated that he

did not receive any financial benefit from Paradigm and that Paradigm was a

legitimate company with employees that performed services for Marie Detty.  Id.

at 263.  The agent did not record the interview in any way; after the interview,

she compiled a report from her notes, neither of which were introduced at trial. Id. at 306-08. Upon return to Oklahoma, the agent was unable to find any of the employees Mr. Smith mentioned, and evidence showed that the checks made out to Paradigm were deposited in Mr. Smith's personal account. Id. at 264, 267, 217.

A grand jury indicted Mr. Smith on ten counts: counts one and two alleged violation of 18 U.S.C. § 664, specifically that Mr. Smith "defeated the plan's right to collect amounts contractually due from the employer . . . by engaging in certain deceptive practices," id. at 11; counts three through eight alleged violation of 18 U.S.C. §§ 2 and 1341, using the mails to facilitate a scheme to defraud Marie Detty, id. at 12-15; and counts nine and ten alleged violation of 18 U.S.C. § 1001(a)(2), based on Mr. Smith's allegedly false statements to the federal agent, Id. at 15-16. The indictment alleged that Mr. Smith made false statements "in the Western District of Oklahoma." Id.

After the government presented its case, Mr. Smith rested and moved to dismiss for lack of evidence and improper venue under Fed. R. Crim. P. 29. Id. at 327-28. The district court granted the motion as to counts three through eight, on the ground that the government had not produced sufficient evidence that Mr. Smith used the mail in his fraudulent scheme. Id. at 332. The district court denied the motion as to counts one, two, nine and ten, and those counts were submitted the jury. Id. The court noted with regard to venue that it "makes sense

. . . in terms of judicial economy, that [the false statement] charges could and should be pursued where other charges are brought." Id. at 333. Over Mr. Smith's objection, the court submitted to the jury a venue instruction that provided, "If you find, by a preponderance of the evidence, that it is more probable than not, that the substance of that [false] statement relayed facts, events, or circumstances which occurred in or related to the alleged wrongdoing occurring in this district, you must find venue is proper in this district and render a verdict of guilty." Id. at 19 (emphasis added). The instruction also indicated that "[t]he parties stipulate that the statements referred to in Counts 9 and 10 were made in Minnesota." Id. The jury returned a guilty verdict on all submitted counts. Id. at 22.

B.     Sentencing.

The district court sentenced Mr. Smith to 27 months in prison and two years' supervised release, along with 104 hours of community service, a special assessment of $400.00, and restitution of $91,689.69. Id. at 23-26. The sentence was based on a total offense level of 18 and a criminal history category of one. Id. at 380, 382. The total offense level included two, two-level enhancements—one for employing sophisticated means and one for abusing a position of trust. 2 Aplt. App. 397.

Mr. Smith timely appealed. Aplt. App. 28. On appeal, he argues that (1) the government's evidence was insufficient to support his conviction on counts

one and two, embezzlement or conversion in violation of 18 U.S.C. § 664; (2) venue was improper for counts nine and ten, false statements in violation of 18 U.S.C. § 1001(a)(2), because the statements were made in Minnesota, not Oklahoma; and (3) the district court impermissibly "double counted" by increasing his sentence twice for the same conduct. Aplt. Br. 9-10. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). After oral argument, we notified the district court to set conditions of release and instructed the government to cease collection efforts on the restitution amounts. See United States v. Sanders, 240 F.3d 1279, 1280 n.1 (10th Cir. 2001). We now reverse with instructions to the district court to vacate the judgment and sentence, and enter a judgment of acquittal for counts one and two and to dismiss counts nine and ten. There was plainly insufficient evidence to support Mr. Smith's conviction for counts one and two, and venue was improper for counts nine and ten.

## Discussion

A.     Violation of 18 U.S.C. § 664.

Our review is de novo as to the sufficiency of the evidence and denial of a motion for judgment of acquittal. United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004). We view the evidence in the light most favorable to the verdict to ascertain whether any rational trier of fact could have found the

defendant guilty beyond a reasonable doubt. Id. Determining witness credibility and weighing the evidence is not our function; we merely ask whether a rational trier of fact could find each element of the offense charged viewing that evidence in the light most favorable to the government. Id.

In relevant part, 18 U.S.C. § 664 imposes criminal sanctions upon "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, . . . or other assets of any employee welfare benefit plan or employee pension benefit plan." 18 U.S.C. § 664. The employee plans referred to include "any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974." Id. Mr. Smith does not dispute that the Plan falls within the ambit of § 664.

To establish violation of § 664, as the court instructed in this case, the government must prove beyond a reasonable doubt that (1) the Plan was subject to ERISA, (2) Mr. Smith embezzled, stole, or abstracted or converted to his use or the use of another an asset of the Plan, and (3) that Mr. Smith acted unlawfully and wilfully. Aplt. App. 346; see 18 U.S.C. § 664.

Mr. Smith argues that the government failed to introduce evidence sufficient to support his conviction. In particular, he notes that the evidence showed only that there was insufficient money to fund the plan—the Board approved the contributions only as part of a non-binding budget, and Oklahoma's

withholding of funds deprived Marie Detty of sufficient funds to make the contributions. Aplt. Br. 16-17. Further, he notes that "there was no evidence shown at trial that [he] deprived anyone of property." Id. at 17. He also argues that there was insufficient evidence that he acted with the requisite intent. Id.

In its response brief, the government contends that Mr. Smith misapprehends the nature of the case: the government never alleged that Mr. Smith actually embezzled, stole, abstracted, or converted funds belonging to the plan. Rather, the government argues—and has always argued—that Mr. Smith "defeated the plan's right to collect amounts contractually due from the employer or its agent by engaging in certain deceptive practices." Aplt. App. 11-12. This argument is premised on the notion that the Board's approval of contributions for fiscal years 2002 and 2003 created a contractual right in the Plan to collect those contributions, and these contractual rights were "plan assets" within the meaning of § 664. Aplee. Br. 19. Mr. Smith, the government argues, "converted" those contractual rights by concealing from the Board the Plan's right to collect the approved-but-unpaid contributions. Id. at 21.

We hold that the government failed to introduce sufficient evidence to sustain the conviction. Specifically, the government failed to introduce evidence that (1) Mr. Smith engaged in embezzlement, theft, abstraction or conversion, and (2) the Board's approval of the contributions created in the Plan an "asset" within the meaning of § 664.

-10-

First, the government's theory of the case is premised on an erroneous interpretation of § 664. In relevant part, the indictment alleges: "[T]he defendant <u>defeated the plan's right to collect amounts contractually due</u> from the employer or its agent by <u>engaging in certain deceptive practices</u>." Aplt. App. 11 (emphasis added), 12 (same). Notably, the specific conduct alleged diverges from the conduct the statute criminalizes, namely embezzlement, theft, abstraction or conversion. <u>See</u> 18 U.S.C. § 664. On appeal the government does not argue that Mr. Smith actually embezzled, stole, abstracted or converted an asset of the Plan. Rather, it argues that "Mr. Smith's offense centered around the concealment of [the Plan's] *right* to collect funds from Marie Detty, and not the concealment of any actual funds," and that "[a] reasonable jury could conclude that Mr. Smith, instead of notifying the Board, intentionally engaged in a number of deceptive practices designed to make the Board believe that contributions to [the Plan] had been made." Aplt. Br. 21-22. This argument implicitly equates "concealment" or "defeat" with embezzlement, theft, abstraction or conversion. According to the government, if it proved that Mr. Smith concealed the Plan's alleged right to collect contributions by deceiving the Board, his conviction should be sustained. <u>Id.</u>

This argument is unavailing. The government cites only one supporting authority. <u>See</u> Aplt. Br. 20-21. In <u>United States v. LaBarbara</u>, the Second Circuit affirmed the defendants' conviction for aiding and abetting conversion of a plan

-11-

asset in violation of § 664. 129 F.3d 81, 88 (2d Cir. 1997). There, Strathmore Concrete Company engaged in a fraudulent "double breasting" scheme to avoid contributing funds to a union pension plan. Id. at 83. The defendant, an officer of the labor union, received $130,000 in kickbacks to ensure the union's cooperation in the scheme. Id. The Second Circuit held that the collective bargaining agreement between Strathmore and the union created a contractual obligation to contribute to the pension fund, and that the contractual right was an asset of the plan. Id. at 88. Thus, the defendant's "acquiescence in the use of the [shell business] as a vehicle to convert those assets to [the principal] and to conceal Strathmore's contractual obligations aided or abetted a violation of section 664." Id. (emphasis added) (citations omitted).

The government's reading of LaBarbara, then, is off base. The Second Circuit did not hold that concealment of the pension plan's contractual right to collect funds itself violated § 664. Rather, it held that the defendant's concealment of the plan's contractual right aided and abetted Strathmore's conversion of plan assets. Id. Thus, the Second Circuit did not conflate concealment with embezzlement or conversion, as the government argues. In the instant case, there is simply no evidence of embezzlement, theft, abstraction, or conversion, and LaBarbara is inapposite.

Second, the government failed to produce evidence from which a reasonable jury could conclude that the approved contributions were assets of the

-12-

Plan. The government cites In re Luna, 406 F.3d 1192 (10th Cir. 2005), for the proposition that they were. Aplt. Br. 19-20. However, in Luna management had entered into a collective bargaining agreement under which it was contractually obligated to make monthly contributions to the pension plan—indeed, the defendants conceded their contractual obligation to make contributions. 406 F.3d at 1197, 1198-99. We noted that this contractual right to collect contributions fit the normal definition of "asset," because under common-law property principles the plan owned a "future interest in the collection of the contractually-owed contributions." Id. at 1199. In other words, we held that the collective bargaining agreement created in the pension fund a valuable property right—the right to collect the contractually-owed contributions. Id.

In this case, there is no contract. Contributions to the profit-sharing plan were purely discretionary, and on at least one occasion the Board did not fund the Plan. Aplt. App. 227. Further, the Board approved the contributions only as part of a prospective budget. Id. at 110, 117-18. Government witnesses testified that the budget was just a proposal or estimate—it was not legally binding, and was subject to funding. Id. at 80, 139-40. Further, the government did not identify to the district court, and does not identify to us, any common-law property concept that supports the notion that the Board's approval of the contributions vested in the Plan a valuable property right. Accordingly, there is no evidence from which a reasonable jury could conclude that the approved-but-unpaid contributions

-13-

constituted Plan assets within the meaning of § 664.  Mr. Smith is therefore correct in arguing that "there was no evidence shown at trial that [he] deprived anyone of any property."[1]  Aplt. Br. 17.

Needless to say, in this case—as in all criminal cases—the government bore the burden of establishing each element of the alleged crime beyond a reasonable doubt.  The government chose to indict based upon Mr. Smith's actions allegedly defeating the Plan's right to collect the approved-but-unpaid contributions.  Yet, the government's argument that "defeating" or "concealing" the Plan's right to collect constitutes embezzlement, theft, abstraction or conversion under § 664 is premised on an erroneous reading of the statute and LaBarbara.  We decline to impose liability for conduct the statute does not forbid.

B.     Venue for Convictions Under 18 U.S.C. § 1001(a)(2).

"Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed."  United States v. Cabrales, 524 U.S. 1, 5 (1998) (internal quotation marks and citation omitted).  If the crime constitutes a "continuing offense"—that is, if it was "begun in one district and completed in another"—it may be "prosecuted in any district in which [the] offense was begun, continued, or

---

[1] We do not reach the question of whether the government could have proven that the approved contributions create a property right in the Plan, only that in this case it failed to do so.

completed." 18 U.S.C. § 3237(a). If, however, the crime "began, continued, and w[as] completed" in only one district, <u>Cabrales</u>, 524 U.S. at 8, it must be prosecuted in that district. <u>Id.</u>

Determining where a crime is committed is not always an easy task. Generally, "the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." <u>Cabrales</u>, 524 U.S. at 6-7 (internal quotation marks and citation omitted). The terms of the statute dictate the nature and acts that constitute a crime. <u>See, e.g.</u>, <u>United States v. Ryan</u>, 894 F.2d 355, 360 (10th Cir. 1990). While not an exclusive test, it is often helpful to look to the verb or verbs used in the criminal statute to determine where the crime was committed. <u>United States v. Rodriguez-Moreno</u>, 526 U.S. 275, 280 (1999).

Title 18 U.S.C. § 1001(a)(2) imposes criminal punishment on "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . <u>makes</u> any materially false, fictitious, or fraudulent statement or representation . . . ." 18 U.S.C. § 1001(a)(2) (emphasis added). The statute does not contain a venue clause, nor is there any language suggesting any "essential conduct element" other than making a false statement. <u>See</u> <u>Rodriguez-Moreno</u>, 526 U.S. at 280. Therefore, the *locus delicti* is where the defendant makes the false statement. <u>See</u> <u>United States v. Wiles</u>, 102 F.3d 1043, 1064-65 (10th Cir. 1996) (en banc),

-15-

vacated on other grounds by United States v. Schleibaum, 522 U.S. 945 (1997).

In this case, Mr. Smith made his allegedly false statement in Minnesota. The agent did not record the statement. Aplt. App. 301, 306-307. It was not a deposition for use in Oklahoma. Id. At trial, the agent did not introduce any notes she took during the interview; rather, she used a report—which she compiled only after she had returned to Oklahoma—to refresh her memory. Id. Indeed, the only connection between Oklahoma and Mr. Smith's statements is that the subject-matter of the allegedly false statements relayed events that occurred in Oklahoma, and at the time there was an investigation in Oklahoma. These circumstances compel the conclusion that the false statements were "made" in Minnesota, and that Mr. Smith's alleged crime occurred in Minnesota.[2]

Tellingly, the government does not argue that Mr. Smith actually made the false statements in Oklahoma—despite the fact that the indictment clearly alleges that Mr. Smith made false statements "in the Western District of Oklahoma." Id. at 15-16. Rather, on appeal the government argues—consistent with the submitted jury instruction, id. at 19—that although the alleged false statements were made in Minnesota, they conveyed events that occurred in Oklahoma, and therefore venue was proper because the crime had substantial contacts with

---

[2]Mr. Smith disputes that the statements were false. Because of our holding that venue was improper, we do not address whether the government introduced sufficient evidence that Mr. Smith's statements were indeed false.

Oklahoma. Aplt. Br. 29-30 (citing United States v. Reed, 773 F.2d 477 (2d Cir. 1985)).

We decline to adopt this "substantial contacts" test. The Constitution and Rule 18 are clear: a crime must be prosecuted in the district where it was committed. See U.S. CONST. art. III, § 2, cl. 3; Fed. R. Crim. P. 18. It is true that in some cases a crime may be committed in multiple districts. For example, a false tax return is "made" both where the form itself is completed and where it is filed with the IRS. Wiles, 102 F.3d at 1064-65. However, that a crime may be committed in multiple districts means only that venue may be proper in any district where the crime was committed—not that venue is proper in every district which has "substantial contacts" with the crime. Further, the Second Circuit has limited the "substantial contacts" rule to continuing offenses. See United States v. Ramirez, 420 F.3d 134, 139 (2d Cir. 2005). Because, as we discuss below, the crime in this case is not a continuing offense, even if we were to adopt the Second Circuit's test it would not apply here.

The government also argues that violation of § 1001(a)(2) is a "continuing offense" and venue is therefore governed by § 3237(a). We have held that giving a false statement may be a continuing offense, where the statement is "made" in more than one district. See Wiles, 102 F.3d at 1064-65. However, that does not mean that all violations of § 1001(a)(2) are continuing violations. Cf. Cabrales, 524 U.S. at 8 (recognizing that while money laundering may be a continuing

-17-

violation where the launderer transports money across state lines, it is not where the entire crime takes place in a single district).

In this case, the alleged crime occurred during an interview conducted in Mr. Smith's home in Minnesota. The false statements began, continued, and ended during the interview. The interview was not recorded, transcribed, or otherwise preserved for use in Oklahoma. Aplt. App. 301, 306-07. Under these circumstances, any violation of § 1001(a)(2) occurred in Minnesota, and consequently venue lay in Minnesota, not Oklahoma.

In light of our disposition on the first two issues, we do not reach Mr. Smith's arguments regarding sentencing.

REVERSED with instructions for the district court to vacate the judgment and sentence, and to enter a judgment of acquittal on counts one and two and DISMISS counts nine and ten for improper venue.