FILED
United States Court of Appeals
Tenth Circuit

May 27, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH LYNN THORNBURGH,

Defendant - Appellant.

No. 09-5156

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:07-CR-00195-CVE-2)**

---

Fred Randolph Lynn, Tulsa, Oklahoma, for Defendant - Appellant.

Charles M. McLoughlin, Assistant United States Attorney (Thomas Scott Woodward, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff - Appellee.

---

Before **TYMKOVICH**, **SEYMOUR**, and **ANDERSON**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

Defendant and appellant Joseph Lynn Thornburgh was found guilty by a jury of conspiracy to commit mail and wire fraud and conspiracy to commit

money laundering.  He was sentenced to 292 months' imprisonment, three years of supervised release, and $3,684,213 in restitution.  Challenging his conviction on seven grounds, Mr. Thornburgh brings this appeal.[1]  We affirm his conviction.[2]

## BACKGROUND

Beginning in the late 1990s, Mr. Thornburgh, along with co-conspirators Robert Searles, Wayne Davidson, Steven Fishman and others, executed a scheme to defraud investors by inducing them to buy allegedly valuable "historic bonds." In reality, the bonds were century-old railroad bonds, issued by a railroad which had long ago gone bankrupt, and bonds issued by a country which no longer exists.  The railroad bonds were issued by the defunct Galveston, Houston & Henderson Railroad ("GH&H Railroad"), and the other type of bond was issued by the Republic of China in the early 1900s ("Chinese bonds").

---

[1]Mr. Thornburgh has filed a motion for leave to file a *pro se* brief and an accompanying addendum.  Because Mr. Thornburgh is represented by counsel, we deny his motion to proceed *pro se* with the brief and appendix.  See United States v. Guadalupe, 979 F.2d 790, 795 (10th Cir. 1992).  To the extent Mr. Thornburgh wishes to claim his counsel was ineffective at trial, that issue must typically be raised on collateral review, not on direct appeal.  See United States v. Hahn, 359 F.3d 1315, 1327 n.13 (10th Cir. 2004) ("Generally, we only consider ineffective assistance of counsel claims on collateral review.").

The government has also filed a motion to supplement the record on appeal. We deny that motion as well.

[2]We are releasing simultaneously with this decision our decision regarding Mr. Fishman, one of Mr. Thornburgh's co-conspirators and his co-defendant at trial.  United States v. Fishman, No. 09-5155 (10th Cir. May 27, 2011).

This conspiracy was much like many other such conspiracies. Mr. Thornburgh and his co-conspirators misrepresented the value of the bonds, claiming that interest in the amount of hundreds of millions of dollars had accrued on the bonds since their issuance, and that payment on that interest was still due and owing. They also misled investors by claiming that the "historic bonds" were backed by Amtrak and/or the United States government.

The conspiracy also involved the use of exotic and enigmatic terminology. Besides the "historic bonds," the scheme involved using the bonds in some vague way to lure unspecified European banks to use proceeds from the bonds (or use the bonds as collateral) to engage in high-yield trading programs.[3] These programs would generate vast sums of money, and the investors were told they would soon receive weekly payments of amounts far larger than their investments.

The conspirators further bolstered their story by representing that the Florida Supreme Court had secretly issued an opinion, being kept under seal in chambers, which established the validity of the bonds. They also determined "hypothecated" values of the bonds, and used individuals called "authenticators" to purportedly verify the authenticity of the bonds. Investors were promised that their bonds were placed in "safekeeping depositories" which issued certificates called "safekeeping receipts."

---

[3]Perhaps because the whole thing was a scheme, the details of the precise workings of the conspiracy are not completely clear.

The entity into which investors placed their money was called Caribou Capital Corporation ("Caribou"), which had been incorporated by Mr. Searles in 1991, apparently for purposes unrelated to the conspiracy. Mr. Searles served as the president of Caribou and the banker for the scheme. He maintained an account for Caribou at SunTrust Bank in Loudon, Tennessee, into which the majority of investor funds were deposited and then distributed to the conspirators. The investors were assured that the program involved little to no risk, and that, if the large returns did not develop, they would receive a complete refund of their investments. Mr. Fishman apparently mentioned to some investors that Norah Cali, allegedly the niece of Alan Greenspan, the former Chairman of the Federal Reserve Board, was involved in the Chinese bond part of the Caribou program.

The enterprise promoted in the United States was not very large, and, at times, it sputtered and slowed. But it still moved along, with its various conspirators interacting with each other in greater and lesser ways. Eventually, the co-conspirators spent much of their time and efforts trying to pacify increasingly anxious and irritated investors, who were becoming suspicious because they had not received the promised large returns.

Each member of the Caribou program had a specific role, although the roles at times overlapped. Mr. Searles acted as the banker and organizer of the conspiracy. He established Caribou as the shell corporation, served as its president, and maintained the SunTrust account. The "authenticator" was John

Clancy, the "program manager" was Patrick Henriette, who resided in Europe, and Mr. Thornburgh and Mr. Davidson were the salesmen who induced investors to buy the bonds. Mr. Thornburgh's primary area of operation was the United States, while Mr. Davidson sought international investors, particularly from New Zealand. Mr. Fishman was involved in many aspects of the conspiracy, including drafting and reviewing documents for Caribou, obtaining bonds, arranging for depositories for the bonds, finding bond "traders," receiving funds, responding to questions from investors, and other functions.

Mr. Thornburgh convinced approximately fifteen individuals in the United States to invest in the Caribou bond scheme. Apparently the total number of investors exceeded 250, the vast majority of whom were lured into the scheme by Mr. Davidson, operating in New Zealand and Australia. Indeed, this circumstance particularly distresses Mr. Thornburgh, as he is required to serve a lengthy prison term and pay over three and one-half million dollars in restitution, whereas Mr. Davidson remains out of the country and has never been convicted for his part in the scheme. The total known loss was $4,057,846.26.[4]

The conspiracy ran from the late 1990s until 2005. Not surprisingly, despite the promises made to investors, the reality of the Caribou program was

---

[4]The United States postal inspector who initially investigated complaints about the Caribou conspiracy testified that there were twenty investors in the United States and 490 international investors, mostly from New Zealand. Tr. of Hr'g at 220, R. Vol. 2, Part 2 at 10.

quite different. The "historic bonds" had only nominal value as collector items, and the "hypothecated" values of the historic bonds were false representations of their worth for investment, redemption, or use as collateral. There was, in fact, no European bank trading program through which to generate profits for the Caribou investors. Finally, "Caribou was incapable of fulfilling its contractual obligations to refund monies to investors because the funds were spent as soon as Caribou received them." Second Superseding Indictment at ¶ 7(g), R. Vol. 1 at 315. Rather than going into the bank trading programs in Europe, investor money went from Caribou to the co-conspirators.

To prove these actions and expenditures, the government introduced evidence of hundreds of emails, telephone calls, mailings, wires and numerous other forms of communication by which the co-conspirators contacted investors, made transactions among themselves, deposited funds in the SunTrust account of Caribou, and otherwise maintained the elaborate fraudulent scheme. Money provided by investors to the SunTrust account was disbursed to the co-conspirators to make payments for purchasing bonds, to pay fees for allegedly authenticating and determining the purported value of the bonds, to pay fees to the safekeeping depositories, to pay "broker" fees to the co-conspirators themselves, to pay personal legal fees and to make occasional payments to investors, which they often called "loans." Mr. Thornburgh, in particular, used investor funds to pay some of his legal fees and to pay for his bail in a domestic

violence prosecution. Additionally, some of the co-conspirators bought a glove

manufacturing plant and shares in a gold mine.

Further, the scheme gained no returns through its claimed relationship with

European banks or based on the value of the bonds that investors bought; any

returns were derived simply from the deposits of more recent investors. Of the

$4,057,846.26 total loss to investors from this scheme, $3,819,315.13 in funds

were laundered through Caribou.

> When investors became suspicious, Mr. Thornburgh and his co-conspirators
>
> provided "lulling" reports about the progress supposedly made by Caribou's associates in securing Caribou's participation in the financial trading programs purportedly conducted by European banks. The co-conspirators' lulling reports repeatedly explained to investors that unforeseen problems had arisen to prevent payments being made to the investors, but that completion of the arrangements for Caribou's participation in the financial trading programs was imminent.

Id. at ¶ 11, R. Vol. 1 at 319. The co-conspirators then attempted to convince

investors that a different type of bond (the Chinese bonds) would be another

fruitful form of investment. In March 2003, the co-conspirators attempted to

further pacify unhappy investors by offering them "hold harmless" agreements

which purported to agree to fully refund their investments if the large returns did

not materialize.

The conspiracy came to a halt following a lengthy investigation that began

with a telephoned complaint in early 2003 to the United States Postal Inspection

Service in the Northern District of Oklahoma. The caller reported that she had made an investment into a program promoted by Caribou Capital Corporation, but had not received the promised return on her investment and was growing suspicious of the program. Several United States federal agencies joined in the investigation, as well as an agency in New Zealand. This investigation led to the indictment against Mr. Thornburgh and his co-conspirators.

Mr. Thornburgh ultimately went to trial on a second superseding indictment, filed on June 2, 2009, alleging a conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349, and a conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (h), and 1957(a). Count one addressed the promotion and sales of the bonds, whose value Mr. Thornburgh vastly overrepresented and whose promised returns he falsified. Count two addressed the distribution, through the SunTrust Caribou account, of funds obtained from the unwitting investors to Mr. Thornburgh and his fellow co-conspirators. He was also subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

Mr. Thornburgh was tried along with Mr. Fishman. Mr. Searles pled guilty, and his recent challenge to his sentence was rejected by this court on direct appeal. United States v. Searles, 2011 WL 488750 (10th Cir. Feb. 11, 2011).

During pre-trial proceedings, Mr. Thornburgh filed a Fed. R. Crim. P. 29 motion for acquittal, in which he argued that there was no evidence of an

agreement to violate the law; there was no evidence that he had a fraudulent intent; evidence that he asked an investor to lie to government agents was not sufficient to establish a conspiracy; and the statute of limitations shielded him from a verdict for the government on both charges. This motion was denied.

Mr. Thornburgh now challenges his conviction, arguing: (1) he withdrew from the conspiracy on July 23, 2002, as a result of which the statute of limitations had expired by the time he was indicted; (2) the government neither pled nor proved that profits from illegal activities were laundered; (3) the district court erred when it failed to instruct the jury that they must find proof that profits were laundered; (4) the district court failed to make findings regarding, or require the government to prove the admissibility of, co-conspirator statements under Fed. R. Evid. 801(d)(2)(E); (5) Mr. Thornburgh was tried for acts that were not illegal when he committed them; (6) he should have been tried separately from his co-defendant, Mr. Fishman; and (7) he did not receive his presentence report ("PSR") in a timely fashion.

**DISCUSSION**

## I.     Withdrawal and Statute of Limitations

Mr. Thornburgh argues that the five-year statute of limitations applicable to the charges in this case had expired by the time the initial indictment was filed on November 30, 2007.  This is because he claims he withdrew from the conspiracy on July 23, 2002.  He argues that this provides him a complete defense.  Mr. Thornburgh accordingly asserts his motion for an acquittal or his motion to dismiss the case against him should have been granted.

"A conspirator . . . is only liable for the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator withdraws."  United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000) (further quotation omitted).  In this case, the jury was instructed that Mr. Thornburgh claimed he had withdrawn from the conspiracy by November 30, 2002 (five years before the indictment was filed).  In finding him guilty, the jury implicitly rejected that claim.

Mr. Thornburgh also attempts to use his claimed withdrawal to support his argument that the statute of limitations had run by the time he was indicted. While convictions for the conspiracies at issue here (to commit money laundering and to commit wire and/or mail fraud) do not "require proof of an overt act in furtherance of the conspiracy," Whitfield v. United States, 543 U.S. 209, 219

-10-

(2005),[5] proof of overt acts can be useful for other purposes. For example, they can be useful in "(1) showing that a conspiracy begun more than five years before the return of an indictment continued into a period within the statute of limitations; [or] (2) showing that a particular defendant knowingly joined (or remained a member of) a conspiracy." Green, 599 F.3d at 372. Similarly, evidence of withdrawal can "have some limited uses such as . . . start[ing] the running of the statute of limitations." United States v. Williams, 374 F.3d 941, 950 n.11 (10th Cir. 2004).

Therefore, we will consider Mr. Thornburgh's arguments about his withdrawal, including evidence of overt acts occurring after the date he claims he withdrew, because he claims they show that the statute of limitations had expired by the time he was indicted. In considering these arguments, "[o]ur review is de novo as to the sufficiency of the evidence and denial of a motion for judgment of acquittal." United States v. Smith, 2011 WL 1367032, at *4 (10th Cir. April 12, 2011). We view the evidence in the light most favorable to upholding the verdict

---

[5]Other cases support the proposition that these conspiracies do not require proof of overt acts to establish guilt. See United States v. Green, 599 F.3d 360, 372 (4th Cir.) ('We are mindful that . . . a money laundering conspiracy does not require proof of an overt act."), cert. denied, 131 S. Ct. 271 (2010), and Boyd v. United States, 131 S. Ct. 340 (2010). We recently stated, in the unpublished decision relating to Mr. Searles (one of Mr. Fishman's co-conspirators) that "[u]nder §§ 1349 (Count One) and 1956(h) (Count Two), it is not necessary for the government to allege that an overt act occurred within the limitations period." Searles, 2009 WL 302306, at *3 (citing Whitfield, 543 U.S. 209 (holding that criminal conspiracies modeled after the Sherman Act, 15 U.S.C. § 1, rather than 18 U.S.C. § 371, do not require proof of an overt act to obtain conviction)).

as we ascertain whether any rational jury could have found the defendant guilty beyond a reasonable doubt. We do not weigh the evidence, nor do we make determinations of witness credibility. "[W]e merely ask whether a rational trier of fact could find each element of the offense charged viewing that evidence in the light most favorable to the government." Id.

"[T]he defense of termination by withdrawal requires that the defendant show that he or she has done 'some act to disavow or defeat the purpose' of the conspiracy." United States v. Gonzalez, 596 F.3d 1228, 1234 (10th Cir.) (quoting Cherry, 217 F.3d at 817-18 (quoting Hyde v. United States, 225 U.S. 347, 369 (1912))), cert. denied, 131 S. Ct. 172 (2010). Communicating one's withdrawal from a conspiracy is not overly difficult: it can be accomplished by affirmative actions "inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." United States v. United States Gypsum Co., 438 U.S. 422, 464-65 (1978).

Mr. Thornburgh claims he withdrew from the conspiracy no later than July 23, 2002. The government claims he continued to participate in the conspiracy, although he no longer communicated with Mr. Searles; rather, both Mr. Thornburgh and Mr. Searles continued to participate in the conspiracy

through Mr. Fishman. Both parties quote transcripts of trial testimony to support their positions.[6]

Mr. Thornburgh quotes from the following testimony of co-conspirator Mr. Searles:

> Q. Now, in your testimony, you alluded to the year 2002, and you made mention that at some point during that year, you and Mr. Thornburgh went your separate ways; is that correct?
> A. July 23rd, yes.
> Q. Why did you center on the date July 23rd?
> A. That's the day he wrote a letter and ended the thing.
>                     . . . .
>
> Q. That was on July 23rd, 2002 . . . .
> A. Yes.
>                     . . . .
>
> Q. And you accepted that as notice that you and he were no longer going to do business together?
> A. I accepted that, that he was serious, that he meant it.

Tr. of Trial Proceedings, Fishman Record, Vol. 3, Part 8 at 1379-80. The government responds that the only change after July 23, 2002, was that Mr. Thornburgh and Mr. Searles stopped talking to each other and, instead, worked with Mr. Fishman as their "mediator." The government accordingly cites the testimony of Mr. Searles and three investors, all of whom testified about

---

[6]As indicated above, Mr. Thornburgh and Mr. Fishman were tried together. While each of them provided a separate record for their appeals, the bulk of the trial transcript is contained in Mr. Fishman's appellate record. We will identify any citations to Mr. Fishman's appellate record if we cite therefrom.

continued interactions and dealings with Mr. Thornburgh after July 23, 2002.

Mr. Searles described the situation as follows:

> Q. Okay. So is there, then, a falling-out between you and
> Mr. Thornburgh?
> A. Yes.
> Q. And when that falling-out takes place, where does Mr. Fishman
> land?
> A. I guess in the middle. He's still doing business with both of us,
> as far as I know.
> Q. All right. And are you still making contact with the investors,
> the American investors?
> A. Yes.
> Q. To your knowledge, is Mr. Thornburgh still making contact with
> those American investors?
> A. I don't know. Some of them told me they had tried to reach him.
> Some of them told me they had reached him. . . .
> . . . .
> Q. And did you do anything in writing with [the] American
> investors? Bringing ourselves up to March of '03.
> A. Yes.
> Q. What did you do?
> A. As time is progressing on, by December [2002], I'm beginning to
> get written demands to me with some of these American investors to get
> back their money. So by January, the pressure is building. So I told
> Mr. Fishman . . . something has got to happen. So he said, well,
> Mr. Thornburgh has entered into a hold harmless agreement with someone,
> and . . . I think this will help you . . . .
> . . . .
>
> So he sent me a copy of the document he had drawn up for Mr. Thornburgh.
> So I took that document, and I revised it for my own needs with my 15
> investors, and I sent it to Mr. Fishman. And he critiqued it for me and sent
> it back to me. And I executed it with the 15 people. And basically, I said,
> if I give you back your money, I don't owe you anything else.

Id. at 1266, 1269.

-14-

The government also cites testimony from a number of investors, including Marsha Longaberger, Jeff Hayslett and Dr. Wayne Maltz, who all described discrete "overt acts" by Mr. Thornburgh after the time he claimed to have withdrawn. Investor Marsha Longaberger described interactions with Mr. Thornburgh in March and April 2003, relating to her investment, including Mr. Thornburgh's request in April that she lie to the postal inspector investigating the Caribou conspiracy. Jeff Hayslett testified that in May 2003, Mr. Thornburgh presented a document to Mr. Hayslett, explaining that "Thornburgh's portfolio manager is now able to provide a line of credit on the bonds, which will result in profits from the joint venture [*i.e.*, the Caribou scheme]." Tr. of Trial Proceedings, Fishman Record, Vol. 3, Part 7 at 968. Furthermore, Mr. Hayslett testified that Mr. Thornburgh convinced him in August 2003 to make yet another bond investment, in a purportedly different type of bond (the Chinese bonds). Additionally, Dr. Wayne Maltz testified that, in late 2002, on numerous occasions in 2003, and on a few occasions in 2004 and 2005, he had, at Mr. Thornburgh's request, paid for Mr. Thornburgh's living expenses and hotel bills incurred while Mr. Thornburgh was in Europe allegedly following through on the bond investments. Some of these payments were characterized by Mr. Thornburgh as necessary to keep the whole bond enterprise afloat. Additionally, Dr. Maltz stated that, in June 2005, Mr. Thornburgh had approached him about further bond

-15-

investments (the Chinese bonds).  Investors Henry Pham and David Franco

testified as to contact with Mr. Thornburgh in 2003 and 2004.

Based on the above testimony, the jury could easily determine that while

Mr. Thornburgh may have decided not to deal directly with Mr. Searles after

July 23, 2002, he remained active in the Caribou bond conspiracy well into 2005.

Furthermore, and significantly, the district court specifically submitted to the jury

the question of whether Mr. Thornburgh withdrew from the conspiracy before

November 30, 2002 (five years before the indictment was filed).  The jury

obviously rejected this defense.  As indicated above, our own review of the

evidence amply supports the jury's determination. Accordingly, the statute of

limitations affords Mr. Thornburgh no defense.


## II.    "Proceeds" of Money-Laundering and Santos

The federal money-laundering statute which Mr. Thornburgh conspired to

violate prohibits various activities involving criminal "proceeds."  See 18 U.S.C.

§ 1956(a)(1)(A)(i).[7]  Since "proceeds" was undefined, the Supreme Court

_____

[7]The relevant money laundering statute, 18 U.S.C. § 1956(a)(1), stated as
follows at all times relevant to this case:

> Whoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlawful
> activity, conducts or attempts to conduct such a financial transaction
> which in fact involves the proceeds of specified unlawful activity . . .
> (A)(i) with the intent to promote the carrying on of specified

(continued...)

-16-

attempted to provide some guidance in United States v. Santos, 553 U.S. 507 (2008), decided prior to Mr. Thornburgh's trial. The question in Santos was what are "proceeds" in the context of an illegal gambling operation. In a divided 4-1-4 decision, the plurality and concurring opinions collectively held that, at least in the context of an illegal gambling operation, "proceeds" means "profits" rather than "gross receipts" for purposes of the money-laundering statute. See id. at 514 (plurality opinion); id. at 528 & n.7 (Stevens, J. concurring in judgment).

Mr. Thornburgh made no argument about Santos in the district court. He also failed to object to the district court's jury instructions which used the term "proceeds" and then stated that "'proceeds' can be any kind of property, not just money." Jury Instructions at 80. Now, however, in reliance on Santos, he argues that the government was obligated to prove that profits from the mail and wire fraud were laundered, not just receipts or gross receipts. He further argues that

---

[7](...continued)
unlawful activity . . . shall be sentenced to a fine of not more than
$500,000 or twice the value of the property involved in the
transaction, whichever is greater, or imprisonment for not more than
twenty years, or both.

The statute has since been amended (in 2009) so that "proceeds" is now defined as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). But because all the relevant activities in this case occurred before 2009, we apply the old version of the money laundering statute.

proof of profits was neither pled nor proven, and that the district court's jury instructions were erroneous because they did not require proof of profits.

Because Mr. Thornburgh did not challenge the definition of "proceeds" in the district court, we review this issue for plain error only. See United States v. Pablo, 625 F.3d 1285, 1301-02 (10th Cir. 2010), petition for cert. filed, No. 10-9789 (March 31, 2011); see also Searles, 2011 WL 488750 (Mr. Thornburgh's co-defendant making the identical Santos argument). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc) (internal quotation marks omitted). An error is "plain" if it is "clear or obvious" under "current, well-settled law." United States v. Whitney, 229 F.3d 1296, 1308-09 (10th Cir. 2000). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." United States v. Ruiz-Gea, 340 F.3d 1181, 1187 (10th Cir. 2003).

Santos has caused considerable disagreement and confusion among the circuit courts of appeal. As we observed in Searles, "[t]he only thing that is 'clear and obvious' about the 4-1-4 Santos decision is that it 'raises as many issues as it resolves for the lower courts.'" Searles, 2011 WL 488750, at *2 (quoting United States v. Brown, 553 F.3d 768, 783 (5th Cir. 2008)). See United States v. Halstead, 634 F.3d 270, 276-77 (4th Cir. 2011) (noting the "division

-18-

among the courts of appeal" and observing that there "are perhaps three groups into which the courts of appeals' decisions [interpreting Santos] might be placed").

Some courts have held that the five justices in the Santos majority agreed that the term "proceeds" means "net profits" only in the context of an illegal gambling enterprise. See United States v. Spencer, 592 F.3d 866, 879 (8th Cir. 2010); United States v. Howard, 309 Fed. Appx. 760 (4th Cir.) (unpublished), cert. denied, 130 S. Ct. 62 (2009); see also United States v. Demarest, 570 F.3d 1232, 1241-42 (11th Cir.), cert. denied, 130 S. Ct. 421 (2009) (holding that it was not plain error to limit Santos to illegal gambling cases); United States v. Bueno, 585 F.3d 847, 850 (5th Cir. 2009), cert. denied, 130 S. Ct. 2359 (2010) (same).

Another group of courts has noted that both the plurality and Justice Stevens "were concerned that the same underlying transactions could support a violation of both the predicate offense and money laundering, the so-called 'merger problem.'" Halstead, 634 F.3d at 277. These courts conclude that whenever there is a merger problem, the term "proceeds" should be defined as "net profits," and when no merger problem is present, the term "proceeds" should be defined as "gross receipts." See United States v. Van Alstyne, 584 F.3d 803, 814 (9th Cir. 2009); United States v. Bucci, 582 F.3d 108, 123-24 (1st Cir. 2009) (suggesting in dicta that this interpretation is correct).

Yet another group of courts acknowledge the merger problem but also note that Justice Stevens relied on the absence of legislative history to conclude that proceeds from an illegal gambling enterprise should mean net profits.  Thus, they conclude that proceeds for money laundering purposes means "gross receipts" unless there is either a merger issue or the legislative history of the money laundering statute indicates that the "net profits" definition is the appropriate one for the particular predicate crime.  See Garland v. Roy, 615 F.3d 391, 401-02 (5th Cir. 2010) (holding that courts must consider both merger issues and legislative history); United States v. Kratt, 579 F.3d 558, 562 (6th Cir. 2009) (holding that courts must look at both legislative history and the merger issue, including whether the merger issue "leads to a radical increase in the statutory maximum sentence"); see also United States v. Yusuf, 536 F.3d 178, 186 n.12 (3d Cir. 2008) (holding that Justice Stevens' concurrence rested on the narrow grounds that proceeds means net profits when there is no contrary legislative history); United States v. Lee, 558 F.3d 638, 642-43 (7th Cir. 2009) (same).

Halstead, one of the more recent circuit courts to address this question, "read Santos to hold that when a merger problem arises in the context of money laundering and illegal gambling, the *required* solution is to define the proceeds of the illegal gambling business as its net profits."  Halstead, 634 F.3d at 279.  When a merger problem arises in the context of money laundering and any other

predicate illegal activity, a case-by-case approach is required, which the court left to another day, but if a merger problem is present, it must be eradicated.  Id.

Our court has recently been confronted with the application of plain error to a Santos issue.  See United States v. Parra, 2011 WL 728088 (10th Cir. March 3, 2011) (unpublished); Searles, 2011 WL 488750.  In those cases, we declined to find a plain error, noting that, in view of the "confusion created by Santos, and the lack of guidance from our circuit, the district court did not commit plain error in its disposition of [the defendant's] case."  Searles, 2011 WL 488750, at *3; see also Parra, 2011 WL 728088, at *5 ("Given the lack of clear authority on the scope of Santos, we cannot say that the district court committed a clear and obvious error by failing to require a showing that the transaction at issue involved profits and not merely gross revenues.").

Against the foregoing background of case law, we can resolve the jury instruction issue presented to us at either of the first two plain error factors. First, as in Fishman, we confine it to its factual setting, and conclude that "proceeds" means "profits" for the purpose of the money laundering statute *only* where an illegal gambling operation is involved.  Second, and alternatively, assuming that Santos dictates that it was error in this case to not require proof of profits, that error cannot be *plain*, in view of the widely differing interpretations of Santos.  See Parra, 2011 WL 728088; Searles, 2011 WL 488750.  We therefore conclude that the district court did not err when, in its instructions to the jury, it

failed to define "proceeds" as "profits" in connection with the Caribou conspiracy.

## III. Co-Conspirator Statements

Mr. Thornburgh argues that he withdrew from the conspiracy on July 23, 2002, so it was error to admit statements made by his co-conspirators after that date. Because we have already concluded that there was ample evidence supporting the jury's finding that Mr. Thornburgh did not withdraw from the conspiracy, that argument has no merit.

He also argues that the district court did not follow the proper procedure before admitting statements by co-conspirators at trial. Mr. Thornburgh moved before trial for a "pretrial hearing, pursuant to United States v. James, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917 (1979), on the admissibility of co-conspirator hearsay." Jt. Mot. & Mem. Requesting Pretrial Hr'g to Determine Admissibility of Co-Conspirator Hearsay. R. Vol. 1 at 102. The district court denied the motion, stating that it would "follow its standard practice and consider the admissibility of co-conspirator statements at trial." Order at 15, R. Vol. 1 at 236. It further instructed the government to "request a hearing outside of the presence of the jury" where the court would "make specific findings as to whether the government has established the existence of a conspiracy by a preponderance of the evidence," such that co-conspirator hearsay statements could be admitted.

Id. Apparently, the government made no such requests at trial, and Mr. Thornburgh made no further objections to the admission of statements by his co-conspirators.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." United States v. Lewis, 594 F.3d 1270, 1282 (10th Cir.) (quoting Fed. R. Evid. 801(c)), cert. denied, 130 S. Ct. 3441 (2010). Under Rule 801(d)(2)(E), a statement by a co-conspirator is not considered hearsay if the court finds that "1) a conspiracy existed; 2) both the declarant and the defendant against whom the declaration is offered were members of the conspiracy; and 3) the statement was made in the course of and in furtherance of the conspiracy." United States v. Eads, 191 F.3d 1206, 1210 (10th Cir. 1999) (further quotation omitted). Thus, at some point in any trial before such statements can be admitted, the government must establish the existence of a conspiracy.

The problem with Mr. Thornburgh's argument here is that he fails to identify any specific statement which he claims was improperly admitted, thereby making it impossible for us to determine whether the statement was admissible or not. He merely lists a string of witness names, but nothing more. As we recently noted in a case presenting the same argument, Mr. Thornburgh "may be correct that the district court never made findings necessary to admit under the coconspirator rule [co-conspirator statements] . . . [b]ut the evidence would be

admissible anyway if it was not offered for the truth of the matters asserted." Lewis, 594 F.3d at 1284. The problem is that "[d]etermining whether a coconspirator's statement is being offered for the truth of the matter asserted often requires careful consideration of both the context of the statement in the coconspirator's conversation and the relevance of the statement to the trial." Id. By failing to specify which statements he claims were improperly admitted, Mr. Thornburgh's brief completely fails to develop this argument. Fed. R. App. P. 28(a) states that "[t]he appellant's brief *must contain* . . . the argument, which *must contain*: . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A) (emphasis added). Mr. Thornburgh's brief completely fails to develop this argument; we therefore do not address it further.

## IV.    Ex Post Facto/Due Process Problem

This argument also depends on Mr. Thornburgh's contention that he withdrew from the conspiracy no later than July 23, 2002. Because one of the statutes of conviction, 18 U.S.C. § 1349, did not go into effect until July 30, 2002, Mr. Thornburgh argues it is a violation of the Ex Post Facto clause to convict him on the basis of conduct which occurred before the statute went into effect. No party asked for a limiting instruction to the jury about this unusual situation and none was given. This issue was not otherwise raised in the district

-24-

court, so we review only for plain error. As indicated above, an error is plain if it affects substantial rights and seriously undermines the fairness, integrity or public reputation of judicial proceedings. "[I]t is the defendant rather than the government who bears the burden of persuasion with respect to prejudice." United States v. Olano, 507 U.S. 725, 734 (1993).

We begin by noting that the Supreme Court has recently clarified the nature of this claimed constitutional violation. In United States v. Marcus, 130 S. Ct. 2159 (2010), there was a situation similar to our case, in that the defendant had been convicted of conduct (violation of the sex trafficking and forced labor statutes) occurring both before and after the effective date of the statutes making that conduct illegal. The defendant had not objected to the district court's failure to address this issue, by means of a jury instruction or some other means, so appellate review by the Second Circuit and the Supreme Court was for plain error.

The Second Circuit, as well as the defendant, had characterized this issue as an Ex Post Facto Clause violation. The Supreme Court disagreed with that characterization, stating that it actually presents a due process question: "[I]f the jury, which was not instructed about the [statute's] enactment date, erroneously convicted [defendant] based exclusively on noncriminal, preenactment conduct, [defendant] would have a valid due process claim." Id. at 2165.[8]

_____

[8]The Court explained why the Ex Post Facto Clause is not involved: "'The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, and does
(continued...)

-25-

Examining the familiar plain error standard, the Supreme Court stated there was "no reason why this kind of error would automatically 'affect substantial rights' without a showing of individual prejudice." Id. The Court therefore remanded the case back to the Second Circuit, where it could apply the plain error standard to the facts of that case, following the Supreme Court's guidance.

On remand, the Second Circuit applied the plain error test and, at the third step of the analysis (whether the error affected the appellant's substantial rights), the court required the appellant to "demonstrate that the error was prejudicial," noting that ordinarily, an error is prejudicial "where there is a reasonable probability that the error affected the outcome of the trial." United States v. Marcus, 628 F.3d 36, 42 (2nd Cir. 2010) (further quotation omitted).

The Second Circuit found, with respect to the forced labor statute, that there was "no reasonable probability that the jury would have acquitted [defendant] absent the error." Id. There were two reasons for that conclusion. First, "the Government presented post-enactment evidence sufficient to satisfy the elements of the forced labor statute." Id. Second, the court found "no reasoned basis to differentiate between [defendant's] pre- and post-enactment conduct, and [it] f[ou]nd no reason to presume that the jury did so." Id. at 43. Additionally, the defendant himself offered no explanation of how his pre- and post-enactment

---

[8](...continued)
not of its own force apply to the Judicial Branch of government.'" Marcus, 130 S. Ct. at 2165 (quoting Marks v. United States, 430 U.S. 188, 191 (1977)).

conduct differed in such a way as to create a reasonable probability that the jury would not have convicted him without the due process error.

The Second Circuit vacated the sex trafficking conviction, however, stating:

> Unlike with the forced labor charge, the conduct supporting the sex trafficking charge differed materially before and after [the date of enactment], such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings.

Id. at 44. We apply that analysis to Mr. Thornburgh's due process argument.

Mr. Thornburgh's argument is spartan when it comes to identifying what acts occurred pre- and post-enactment. He simply states, "[t]he volume and frequency of the mention of pre-enactment conduct combine to make very likely the jury found guilt based on such conduct. Almost all of the Government's witnesses testified about pre-enactment conduct." Appellant's Opening Br. at 18.

The government concedes it was error for the district court to fail to instruct the jury on the fact that § 1349 did not come into effect until July 30, 2002. We agree that is an error, which is plain. We must next determine, as did the Second Circuit in Marcus, whether that error was prejudicial because there is a reasonable probability that the error affected the outcome of the trial. As in Marcus, so too in this case, the government presented "post-enactment evidence sufficient to satisfy the elements of" the conspiracy-to-commit-wire/mail-fraud statute. Marcus, 628 F.3d at 42.

-27-

Additionally, we consider whether there is a "reasoned basis to differentiate between [Mr. Thornburgh's] pre- and post-enactment conduct." Id. at 43. The evidence outlined above provides no such basis. Nor does Mr. Thornburgh provide us with such a basis except for a reference as to the volume of his activities. But we have no reason to presume that the jury differentiated between the two and convicted him on the basis of the volume of pre-enactment conduct only.

In short, while it may have been an error for the district court to have failed to specifically instruct the jury that § 1349 was not effective until part way through the conspiracy, perhaps even a plain error, that error did not affect Mr. Thornburgh's substantial rights, nor did it affect the fairness of the proceedings. There was substantial evidence that the conspiracy continued long after § 1349 went into affect. There was therefore no due process violation in Mr. Thornburgh's trial.


## V.    Severance

Mr. Thornburgh's next argument is that the district court should have *sua sponte* severed his trial from Mr. Fishman's because they were employing different and conflicting defenses. Because this issue was not raised below, our review is for plain error, employing the tests set out above.

Mr. Thornburgh claims that his defense was primarily that he withdrew from the conspiracy in time for the statute of limitations to insulate him from liability. He argues that Mr. Fishman's defense was that he had acted in good faith and therefore had not committed a crime. Mr. Thornburgh baldly asserts that these defenses are inconsistent, but he fails to explain why. We have held that, in considering whether to grant a motion to sever, the trial court must "determine whether the defenses are 'so antagonistic that they are mutually exclusive.'" United States v. Pursley, 474 F.3d 757, 765 (10th Cir. 2007) (quoting United States v. Peveto, 881 F.2d 844, 857 (10th Cir. 1989)). Furthermore, "because mutually antagonistic defenses are not prejudicial per se, a defendant must . . . show a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." Id. (internal quotations and alterations omitted). Mr. Thornburgh fails to identify a specific trial right or explain how the claimed conflict between his defensive strategy and Mr. Fishman's strategy prevented the jury from making a reliable judgment about his guilt.

Furthermore, both Mr. Thornburgh and Mr. Fishman pursued both defenses. And, they both requested and received a withdrawal-from-the-conspiracy instruction and a good faith defense instruction. We accordingly can discern no plain error.

**VI.    Recess**

Mr. Thornburgh next argues that the district court should have ordered a recess on the two occasions where Mr. Thornburgh was excused from attendance so that he could receive medical care.  Mr. Thornburgh, however, clearly waived his right to be present on the day or days that he was absent.[9]  He may not now claim "error" as a result of something he both clearly waived and also invited.

The facts surrounding this issue are as follows:  At one point during his trial, Mr. Thornburgh's attorney advised the court that Mr. Thornburgh had a "medical situation" and that he had "been advised that he needs to seek medical attention."  Tr. of Jury Trial, Fishman R. Vol. 3, Part 6 at 725.  When the court inquired if Mr. Thornburgh wished to go to the Oklahoma Heart Institute, his attorney stated that he had discussed the situation with Mr. Thornburgh, and they had decided that "today would be [a] good time for him to seek medical attention, maybe get better, so that he can return to court in a healthy role, where he may even be more needed to confront the witnesses."  Id. at 726.  The parties then agreed on the language to be used to instruct the jury about Mr. Thornburgh's absence, and Mr. Thornburgh left to receive medical treatment.

The transcript reveals that the district court was very solicitous of Mr. Thornburgh and made it very clear that Mr. Thornburgh's absence was voluntary.

---

[9]It is unclear exactly how much time Mr. Thornburgh was absent from the court for medical tests.  It appears to have been for some indeterminate time on two occasions.

Furthermore, Mr. Thornburgh's counsel not only did not move for a continuance, he expressly stated to the court that he thought it best for his client for the trial to continue without interruption. Thus, the court committed no error in permitting Mr. Thornburgh to leave for a short time to attend to his health issues.

## VII. Receipt of PSR

Mr. Thornburgh's final argument is that "[w]hile there is some evidence to suggest otherwise . . . , Mr. Thornburgh argues that he did not receive his Presentence Investigation Report in a timely manner." Principal Br. of Appellant at 21. There is indeed evidence to suggest otherwise. At his sentencing hearing, the court specifically asked defense counsel if he "had timely receipt of the Presentence Report?" Tr. of Sentencing Hr'g at 3, R. Vol. 2, Part 1 at 200. Mr. Thornburgh indicated he had received it, and, furthermore, had no objections, corrections or changes. That disposes of this issue.

## CONCLUSION

For the foregoing reasons, the conviction of Mr. Thornburgh is AFFIRMED. As indicated above, any pending motions have been denied.